## Lynch *versus* Commonwealth.

| | |
|---|---|
| 77 | 205 |
| 145 | 297 |
| 77 | 205 |
| 168 | 618 |
| 77 | 205 |
| 193 | 623 |
| 77 | 205 |
| 202 | [3]152 |
| 77 | 205 |
| f220 | [2]379 |

1. Precepts for selecting grand jurors and jurors were directed to " the sheriff and *commissioners of said county;*" the certificate to the return was that the list was " drawn by the sheriff and *jury commissioners,*" and it was signed by the sheriff and A. H. & J. Y., "*jury commissioners.*" *Held,* that if an error, it was but clerical, and was cured by 53d sect. of Criminal Procedure Act, March 31st 1860.

2. Lynch, suspecting that his sister was in the act of adultery, listened at the door of her chamber, and being confirmed in his suspicions, took his knife from his pocket, opened it, and forced the door in. He found her rising from the bed, undressed, and a man in bed; he stabbed the man three times with the knife; of one of the strokes the man died. *Held,* that the provocation was not sufficient to reduce the killing to voluntary manslaughter. Per STARRETT, P. J.

3. Where the killing is admitted and insanity is alleged, the prisoner must satisfy the jury that insanity existed when he did the act, a doubt as to insanity will not justify an acquittal. *Id.*

4. The law presumes sanity; if no insanity is shown, and the person was sane shortly before and afterwards, the presumption is of sanity at the time of the act. *Id.*

5. Murder of the first and of the second degree, and voluntary manslaughter defined in this case. *Id.*

November 3d, 1873. Before READ, C. J., AGNEW, SHARSWOOD, WILLIAMS and MERCUR, JJ.

Error to the Court of Oyer and Terminer of *Allegheny county*: Of October and November Term 1873, No. 31.

In this case Ambrose E. Lynch was indicted at the June Sessions 1872, of the Oyer and Terminer of Allegheny county, for the murder of William Hadfield.

The precept of the Judges of the Court of Oyer and Terminer, to the clerk of the court, &c., commanded him to " issue a venire facias to the *sheriff and commissioners of the county* aforesaid," to proceed to select twenty-four persons to serve as grand jurors, &c. The precept was dated April 2d 1872, and signed by the three judges.

The venire bearing the same date was directed " to the sheriff and *commissioners* of said county." To the return to the venire, to which was annexed a list of the jurors, was the following certificate :—

" We do hereby certify that the foregoing is an accurate list of persons drawn by the sheriff and jury commissioners to serve as grand jurors," &c.

This was signed　　　　　" HUGH S. FLEMING, Sheriff.
" A. B. HAYDEN, JOHN YOUNG, Jr., Jury Commissioners."

The precept of the judges to the clerk to issue a venire for traverse jurors, the venire, the return to the venire, and the certificate, were all in a similar form.

The jury to try the indictment was empannelled on the 8th of July 1872, and the cause proceeded to trial before Starrett, P. J.

and Stowe J., no objection having been made to the precepts, &c., in relation to the jurors.

The evidence was that the prisoner lived with his sister, who was a married woman, in Allegheny city; that on the 11th or 12th of June 1872, about midnight, the deceased was found by George Smithson, in a street in Allegheny city, wounded; shortly afterwards the defendant came up with a knife in his hand; said he had killed that man, he had cut him; he said "if he had had a larger knife he would have put him through faster." To an officer of the peace who took him to the mayor's office, the prisoner said whilst going there, " I was only at home a few minutes when I heard a noise, I listened and heard a creaking, took out my knife and said that they can't fool me on that business." Prisoner said he then took out his knife and opened it; he put his shoulder to the door and shoved it; it did not go in the first time; he put his shoulder to it the second time and it went in; just as the door went open, his sister was getting out of bed undressed; he struck the deceased twice with the knife whilst on the bed; deceased got up and " went for me on the floor," and prisoner gave him another stroke in the breast. To another witness prisoner said, he had " given it to him twice in the bed and once afterwards;" he said he had found the deceased in his sister's bed.

These statements were all made on the night of the killing. The deceased was taken to the mayor's office, and died about 1 o'clock of the same night.

The sister, examined by the Commonwealth, testified that her husband had been away about five weeks; that she and the deceased were sitting in the room together, but denied that there was any impropriety between them. Whilst sitting there the prisoner bursted into the room and knocked her down; when she came to, the deceased was gone. Her brother asked her if she was in ·bed with a man; her brother " was clear crazy; he acted more like a crazy man than a drunken one."

The defendant's points were :—

1. If on the night of the killing the defendant found or supposed he found, the deceased in bed with defendant's married sister, and was thereby so much excited as for the time to overwhelm his reason, conscience and judgment, and cause him to act from an uncontrollable and irresistible impulse, the law will not hold him responsible.

The court, Starrett, P. J., answered :—

" As this point seems to amount to the proposition, that if the prisoner was temporarily insane at the time he did the cutting, he is not guilty of any legal offence, it is affirmed as an abstract proposition of law. If the defendant was actually insane at the time, this, of course, relieves him from criminal responsibility from whatever cause the insanity arose. But the jury must not confound

anger or wrath with actual insanity, because however absurdly or unreasonably a man may act when exceedingly angry, either with or without cause, if his reason is not actually dethroned, it is no legal excuse for the violation of law."

2. If the jury have a reasonable doubt as to the condition of defendant's mind at the time when the act was done, he is entitled to the benefit of such doubt, and they cannot convict.

The court answered :—

" The law presumes sanity when an act is done if no insanity is shown by the evidence ; and when it appears that a man was sane shortly preceding the act and shortly after, the presumption exists of sanity at the time of the act ; and no jury has a right to assume otherwise, unless the evidence in connection with the act fairly convinces them that the defendant was actually insane at the moment the act was committed.

" This point is refused."

Judge Starrett, in a charge of great ability, having given instructions to the jury as to their duties, and having defined murder at common law, and under the Acts of Assembly of Pennsylvania, proceeded :—

\* \* \* " In the case before us we have to deal only with that kind of murder in the first degree described as *wilful, deliberate* and *premeditated.* Many cases have been decided under this clause in all of which it has been held that the *intention* to kill is the essence of the offence ; therefore if the intention to kill exists it is *wilful ;* if this intention be accompanied by such circumstances as evidence a mind fully conscious of its own purpose and design, it is *deliberate ;* and if sufficient time be afforded to enable the mind fully to frame the design to kill, and select the instrument or to frame the plan to carry the design into execution, it is *premeditated.* The law fixes no length of time as necessary to form the intention to kill, but leaves the existence of a fully formed intent as a fact to be determined by the jury from all the facts and circumstances in the evidence. If there be time to frame in the mind, fully and consciously, the intention to kill and to select the means or weapon of death, and to think and know beforehand the use to be made of it, there is time enough to *deliberate* and *premeditate,* though that may be very short. The proof of the intention to kill and the disposition of mind constituting murder of the first degree, under the Act of Assembly, lies on the Commonwealth ; but this proof need not be *express* or *positive ;* it may be inferred from the circumstances. If from all the facts attending the killing the jury can reasonably and satisfactorily infer the existence of the intention to kill and the malice of heart with which it was done, they will be warranted in doing so. He who uses on the body of another at some vital part with a manifest intention so to use it, a deadly weapon, such as an axe, a pistol or

a knife, must, in the absence of qualifying facts, be presumed to know that his blow is likely to kill; and knowing this, must be presumed to intend death, which is the ordinary and probable consequence of such an act. Hence he who takes the life of another with a deadly weapon and with a manifest design thus to use it upon him, with sufficient time to deliberate and form the conscious purpose of killing, and without any sufficient reason or cause of extenuation, is guilty of murder in the first degree. When the act is done deliberately, with a deadly weapon, and is likely to be attended with dangerous consequences, the *malice* requisite to murder will be presumed, for the law infers that the natural or probable effect of any act deliberately done, is intended by the actor. When the killing then is malicious and the evidence shows a wilful, deliberate and premeditated purpose to take life, it is murder in the first degree.

" Manslaughter is defined to be the unlawful killing of another *without malice*, expressed or implied; which may be voluntary, done in a sudden heat, or involuntary, but in the commission of an unlawful act. Voluntary manslaughter often so nearly approaches murder that it is necessary to distinguish it clearly. The difference is this: manslaughter is never attended by legal malice or depravity of heart—that condition or frame of mind, before spoken of, exhibiting wickedness of disposition, recklessness of consequences or cruelty. Being sometimes a wilful act (as the term *voluntary* denotes), it is necessary that the circumstances should take away every evidence of cool depravity of heart or wanton cruelty. Therefore to reduce an intentional blow, stroke or wounding, resulting in death, to voluntary manslaughter, there must be sufficient cause of provocation and a state of rage or passion without time to cool, placing the accused beyond the control of his reason and suddenly impelling to the deed. If any of these be wanting, if there be provocation without passion or passion without legal provocation, or if there be time to cool and reason has resumed its sway, the killing will be murder. But it is not every cause of provocation that is regarded as sufficient or legal. Insulting or scandalous words are not sufficient cause of provocation; nor are actual indignities to the person of a light and trivial kind. Whenever the act evidences a deadly revenge and not the mere heat of blood; whenever it is the result of a devilish disposition and not merely the phrensy of rage, it is not manslaughter but murder. Passion arising from sufficient legal provocation is evidence of the absence of malice.

" [It is claimed by the prisoner in this case that on going to his sister's house at a late hour in the night, he heard a noise in his sister's room, and thought that something wrong was going on there; listened awhile and becoming convinced that his suspicions were well founded, he took out his knife and opened it, put

[Lynch *v.* Commonwealth.]

his shoulder to the door, forced it in and found his sister there in her night-dress and the deceased in the room with her; that he was greatly excited and enraged, and in the heat of passion thus generated, he stabbed the deceased twice in the back and once in the breast. Assuming all this to be true, does it amount in law to sufficient cause of provocation to reduce the killing to manslaughter? We are of opinion that it does not; that there is nothing in these circumstances, as they are claimed to exist by the prisoner, that would reduce the grade of the offence to voluntary manslaughter.] It is the duty of the court to say, as matter of law, what fact or facts will amount to sufficient legal provocation, if they are found by the jury. In other words, it is for the jury to find what the facts are and for the court to say what effect shall be given them. Assuming then the facts to be as claimed by the prisoner in this regard, we say, that they do not amount to sufficient or legal provocation, such as would reduce the grade of a felonious homicide to manslaughter. * * *

" It is not denied, nor could it be successfully, that the prisoner inflicted the wounds which were found on the body of the deceased, William Hadfield, and which caused his death. There is no serious conflict as to the time, place and circumstances under which the mortal stab was inflicted. There is no evidence to show and we do not understand that it is claimed by the prisoner, that the mortal wound was inflicted in self-defence. Instead of being attacked he himself was the assailant. It is proven by his own admissions, that he suspected the infidelity of his sister, and after listening at her door a few minutes, he took out his knife, opened it, and broke the door leading into her room, and then thrice stabbed the deceased. What did he open his knife for before he forced open the door? Was it for the purpose of aggression or defence? What did he intend to do with the open knife? What did he do with it? These are all pertinent inquiries, and doubtless you will find answers to all of them in the evidence before you. We have no means of judging as to the motives of men except by their actions and declarations. What then did the acts of the prisoner in taking out and opening his knife, and then forcing open the door of his sister's room, and then burying the knife almost to the hilt in the body of Hadfield, indicate as his intent and purpose? In the same connection his declaration to the witness Smithson, soon after the cutting, that if he had had a larger knife he would have put him through faster, should be considered as bearing upon the intent with which the stabbing was done; and in the same connection also you will remember the impious and blasphemous expression of the prisoner when he was informed Hadfield was dead. It is from these and other circumstances in evidence to which I have not referred, that you are to determine the state of his mind at the

27 P. F. SMITH—14

time the stabbing was done; whether he was actuated by malice and whether he intended to do what he actually did accomplish, viz.: take the life of Hadfield.

" The general rule is that all homicide is presumed to be malicious —that is, murder of some kind—until the contrary appears in evidence. Hence the burden of reducing the crime from murder to manslaughter, where it is shown that the prisoner committed the deed, lies on him. He must show all the circumstances of alleviation or excuse upon which he relies to reduce his offence from murder to a milder kind of homicide, unless indeed where the facts already in evidence show it. But though the homicide without the circumstances of alleviation or excuse is presumed to be murder, it is not always presumed to be murder of the first degree: it must be shown by the Commonwealth to be murder of the first degree. The jury must be satisfied as to the facts and circumstances which indicate the intention to kill, and the depravity of heart and conscious purpose which constitute, as already explained, the crime of murder of the first degree.

" It is said that immediately after the commission of the deed, the prisoner looked like a crazy man. Is there anything remarkable in this? When a man permits his angry passions to become aroused; when he resolves upon deeds of violence and carries them into execution, even to the taking of the life of a fellow being, it would be singular indeed if the vengeance that rankled in his breast would not clearly manifest itself by outward expressions. If such manifestations of a wicked heart, bent upon vengeance and the gratification of malicious passion, are to be seriously considered as sufficient evidence of insanity, how are deeds of violence and bloodshed ever to be punished? A learned author has said that the mind is always greatly troubled when it is agitated by anger, bewildered by jealousy, or corrupted by an unconquerable desire for vengeance. Then, as is commonly said, a man is no longer master of himself; his reason is affected; his ideas are in disorder; he is *like a madman.* But in all these cases the man does not lose his knowledge of the real relation of things; he may exaggerate his misfortune, but this misfortune is nevertheless real, and if it carry him to commit a criminal act, this act is perfectly *well motived.* In such case it will generally be found that revenge, anger and kindred emotions of the mind, constitute the *real motive* which has occasioned the homicidal act, if such act has been committed." * *

The court then read and answered the defendant's points, as before stated; and instructed the jury as to the character and effect of " a reasonable doubt."

The jury, July 10th 1872, found the prisoner guilty of murder in the first degree.

After a motion for a new trial, which was overruled, the prisoner was, on the 18th of January 1873, sentenced to be hung.

[Lynch v. Commonwealth.]

The prisoner removed the record to the Supreme Court by writ of error, and there assigned for error:—

1, 2. The alleged irregularities in the precepts, return, &c., of the venires.

2, 3. The answers to his points.

5. The part of the charge in brackets.

6. The ingredients necessary to constitute murder in the first degree were not proved to exist.

*Ferguson & Murray*, for plaintiff in error, as to the 5th assignment, cited Brooks v. Commonwealth, 11 P. F. Smith 352; Drum v. Commonwealth, 8 Id. 9.

*T. M. Bayne*, District Attorney, and *W. D. Moore*, for Commonwealth, defendant in error, cited Wharton on Homicide 177, 178; 1 Wharton's Crim. Law, §§ 55, 711.

Chief Justice READ delivered the opinion of the court, November 22d 1873.

By the 2d sect. of the Act of 10th April 1867, it is made the duty of the jury commissioners, president judges, or additional law judges of the respective district, to meet at the seat of justice of the county, at least thirty days before the first term of the Court of Common Pleas in every year, and select the jurors agreeably to the provisions of said section, who are to serve as jurors in the several courts of such county, during that year. The names of the persons so selected shall be placed by them, or a majority of them, in the proper wheel, in the mode and manner directed by law. The 3d sect. describes how the jury commissioners and sheriff shall draw from the proper jury-wheel the different panels of jurors.

The precepts in this case, and the venires for the grand and petit or traverse jurors, were issued on the 2d April 1872, and on the 15th of the same month were returned in due form by the sheriff and jury commissioners, by whom the names of the grand and traverse jurors were drawn from the jury-wheel in due form of law. The error assigned in both cases is the same; the clerical error of using the words " commissioners of said county," instead of "jury commissioners." Everything else in the whole proceeding was right, and the alleged error was not discovered until several months after the trial.

These alleged defects or errors are cured by the 53d sect. of the Criminal Procedure Act of the 31st March 1860, which enacts that " no verdict in any criminal court shall be set aside, nor shall any judgment be arrested or reversed, nor sentence delayed for any defect or error in the præcipe issued from any court, or the venire issued for the summoning and returning of jurors, or any defect or error in drawing or returning any juror or panel of jurors,

but a trial or agreement to try on the merits, or pleading guilty, or the general issue in any case, shall be a waiver of all error and defects in or relative or appertaining to the said precept, venire, drawing or summoning and returning of jurors.".

Ambrose E. Lynch was indicted for the murder of William Hadfield, on the night of the 12th June 1872, by stabbing him with a knife, and was tried in July of the same year, and convicted of murder in the first degree. The circumstances attending the murder are few, and may be told very briefly. The sister of the plaintiff in error lived in a small house in Allegheny city, of whom the defendant, Lynch, was a guest. Late at night Lynch came in by a side door, and was in only a few minutes when he heard a noise, listened and heard a creaking, took out his knife and opened it. He put his shoulder to the door and shoved it; it did not go in the first time; put his shoulder to it the second time and it went in, and he saw his sister getting out of bed. He struck the deceased twice in the back, in the bed, with his knife, and a third time when on the floor in the breast. This last was the mortal wound, of which Hadfield died between twelve and one o'clock the same night. We have omitted the profane and blasphemous language made use of by the defendant Lynch.

We have read over with great care the very able charge of Judge Starrett, who explains very fully to the jury the different degrees of felonious homicide, murder in the first degree, murder in the second degree, voluntary and involuntary manslaughter.

This brings us naturally to a part of the charge following this explanation, which is assigned as the fifth error. It is evident from the language used that the prisoner's counsel was endeavoring to reduce the crime to that of voluntary manslaughter, with which the court certainly did not agree. "It is claimed," says the learned judge, " by the prisoner in this case, that on going to his sister's house at a late hour in the night he heard a noise in her room—suspected that something wrong was going on there— listened awhile, and becoming convinced that his suspicions were well founded, he took out his knife and opened it, put his shoulder to the door, forced it in, and found his sister there in her night dress, and the deceased in the room with her ; that he was greatly excited and enraged, and in the heat of passion thus generated, he stabbed the deceased twice in the back and once in the breast. Assuming all this to be true, does it amount in law to sufficient cause of provocation to reduce the killing to manslaughter. We are of opinion that it does not, that there is nothing in these circumstances, as they are claimed to exist' by the prisoner, that would reduce the grade of the offence to voluntary manslaughter. It is the duty of the court to say, as matter of law, what fact or facts will amount to sufficient legal provocation if they are found by the jury. In other words, it is for the jury to find what the

[Lynch v. Commonwealth.]

facts are, and for the court to say what effect shall be given them. Assuming, then, the facts to be as claimed by the prisoner in this regard, we say that they do not amount to sufficient or legal provocation, such as would reduce the grade of a felonious homicide to manslaughter.

In all this there was clearly no error.

The third error assigned is to the answer of the court to the defendant's first point, which was, " that if on the night of the killing defendant found, or supposed he found, the deceased in bed with defendant's married sister, and was thereby so much excited as for the time to overwhelm his reason, conscience and judgment, and cause him to act from an uncontrollable and irresistible impulse, the law will not hold him responsible."

This seems very vague and uncertain, but the court say, " as the point seems to amount to the proposition, that if the prisoner was temporarily insane at the time he did the cutting, he is not guilty of any legal offence, it is affirmed as an abstract principle of law. If the defendant was actually insane at the time, this of course relieves him from criminal responsibility, from whatever cause the insanity arose. But the jury must not confound anger or wrath with actual insanity ; because, however absurd or unreasonable a man may act when exceedingly angry, either with or without cause, if his reason is not actually dethroned, it is no legal excuse for violation of law." There is no error in this answer.

The fourth error assigned is to the answer to the defendant's second point, which is. " That if the jury have a reasonable doubt as to the condition of defendant's mind, at the time the act was done, he is entitled to the benefit of such doubt, and they cannot convict."

As to the second point the court said " the law of the state is, that where the killing is admitted and insanity or want of legal responsibility is alleged as an excuse, it is the duty of the defendant to satisfy the jury that insanity actually existed at the time of the act, and a doubt as to such insanity will not justify the jury in acquitting upon that ground. The law presumes sanity when an act is done, if no insanity is shown by the evidence, and when it appears a man was sane shortly preceding the act, and shortly after, the presumption of sanity exists at the time of the act, and no jury have a right to assume otherwise, unless evidence in connection with the act convinces them that the defendant was actually insane at the moment the act was committed. This point is refused," and rightly, and it needs no argument to show that the court were entirely correct in their ruling and answer.

The sixth error is not sustained, for it is clear the ingredients necessary to constitute murder in the first degree were proved to exist, and in determining this to be the case we have reviewed both the law and the evidence.

Sentence affirmed and record remitted.