# Taylor *versus* The Commonwealth.

1. On the trial of an indictment for murder, it appeared that the accused, who was a convict in the penitentiary, killed his keeper while the latter was in the prisoner's cell yard for the purpose of locking him in his cell. The physician who made the autopsy was called by the Commonwealth and asked whether a certain wound found on the head of the deceased could have been made by a spool or bobbin found in the prisoner's cell just after the murder. This was not accompanied by any offer to follow the question by proof that the spool was really the instrument used to strike the blow, but subsequently in the further examination of the physician he testified that the spool was stained with blood and had several hairs sticking to it and that the shape of the wound showed it to have been made by the spool:

   *Held,* that if there were any valid objection to the admission of the question it related merely to the order of time when it was asked, and that in view of the witness's subsequent testimony, its admission was not ground for a reversal.

2. Upon being arraigned the prisoner pleaded not guilty. Eight days afterwards the jury was sworn, without objection. The defence then asked to withdraw this plea and file a plea that the prisoner was a lunatic at the time of the trial. This the court refused and instructed the jury that if they found the prisoner insane during the trial, but not at the commission of the crime, they might say so in the verdict and the court would delay judgment and stay execution. *Held,* that in view of the time when this application was made, the prisoner received all the protection therefrom to which he was entitled.

3. Certain witnesses, not experts, were called to testify to acts of the prisoner within their knowledge, and conversations with him, and were then asked their opinions as to his sanity:

   *Held,* that having testified to the acts and conversations upon which these opinions were based the same were admissible, and it was for the jury to decide whether the acts and conversations justified the opinions. Such evidence is admissible in criminal as well as civil causes.

4. While a slight departure from a well balanced mind may be pronounced insanity in the medical science, yet such a rule cannot be recognized in the administration of the law, when a person is on trial for the commission of a high crime.

5. The question of the degree or extent of unsoundness of mind necessary
   to acquit one who has committed a homicide, discussed, and the rulings
   of the court below thereon in this case, affirmed.

March 9th, 1885. Before MERCUR, C. J., GORDON, PAX-
SON, TRUNKEY and STERRETT, JJ. GREEN and CLARK, JJ.,
absent.

ERROR to the Court of Oyer and Terminer and General
Jail Delivery of *Philadelphia county* : Of January Term 1885.
No. 220.

Indictment of Joseph Taylor for the murder of Michael F.
Doran.

When the prisoner was arraigned he pleaded not guilty. On
the trial before LUDLOW, P. J., after the jury had been sworn,
counsel moved to withdraw this plea and file a plea that Tay-
lor was a lunatic at the time of the trial. This motion was re-
fused by the court and the jury instructed that " if the prison-
er should appear to be insane during the trial (but not at the
commission of the crime), the jury, if that fact appears, may
say so in their verdict, or the court would delay judgment, or
an execution would be stayed, if issued." (Fifth, sixth and
seventh assignments of error.)

The material facts were as follows : Taylor was serving a
term of imprisonment in the Eastern Penitentiary. On May
31st, 1884, Woltemate, an overseer in the penitentiary let
Taylor out of his cell, about seven o'clock in the morning,
into the cell yard, an enclosure about 8 by 16 feet with a gate
opening into it from the cell and another gate opening into
the main yard, for exercise. About an hour later Doran, who
was Taylor's regular keeper, went into Taylor's cell yard
through the main yard gate, to lock Taylor in his cell. About
nine o'clock Doran was found lying in Taylor's cell yard on
his face, obliquely across the yard, with his feet toward the
main yard gate and with his head and face cut and crushed.
Doran was removed and died at five o'clock in the afternoon.

The prosecution contended that as Doran passed into Tay-
lor's cell yard, through the main yard gate, Taylor struck him
from behind with a large spool or bobbin, (used by Taylor in
his work) and then struck him again with a heavy iron bar,
which was used to fasten the cell door. The cause for the killing
alleged by the prosecution was that Taylor was angry at Dor-
an for a supposed injury ; that he had been given medicine to
destroy his desire for masturbation, and this having taken
effect, after he ceased taking it, he imagined that Doran was
still giving him medicine in his food.

Dr. R. S. Huidekoper a witness called by the Common-
wealth testified as follows :

I am coroner's physician ; made the autopsy on the body of Michael Doran ; the body was identified May 31st, 1884, by Michael Campbell and Dr. Robinson. I found the body slightly warm, and stiffness of muscles not yet set in. On the back of the head, to the right hand side, there was a lacerated cut from the right hand side running obliquely from centre outward and from above downward ; it had a sharp edge above and bruised below. On the front of the face and head, on the right hand side of the nose, there was a cut one and one-quarter inches long, and had crushed in the bones of the nose ; the wound was lacerated by a moderately sharp instrument. In the median line, over forehead, there was a straight cut through the skin without breaking the bone ; over the left ear there was a cut of the same nature ; over the right eye there was a cut through the skin to the bone without fracturing the bone ; over the left temple there was an oblong cut about two fingers' width in length ; there was a lacerated cut and a flap of skin turned.

*Q.* Could any instrument like this (showing iron bar) produce the wound you have described (to be followed by proof that this is the identical instrument) ?

*A.* This instrument could produce all the wounds except the wound on the back of the head.

*Q.* Could this spool, or an instrument like this, produce the wound on the back of the head (showing witness the spool) ? Objection by defendant's counsel because the question allows an assumption against the prisoner that the spool was used, by permitting the witness practically to state that the spool caused the wound ; and because it permits a physician to give his opinion upon a question as to which he is not competent. Objections overruled and evidence admitted. (First assignment of error.

*A.* Yes. The cause of the death was blood-clot on the brain.

*Cross-examination :*

The wound on the back of the head was about two and one-quarter inches long, at an angle of 45° from the median line downward. The wound on the upper edge was a straight line, and the lower edge was forced away and bevelled downward with a convexity ; the sharp edge of the iron bar would not do it. It was impossible to produce such a wound if the man was lying on his face. . . . . . On May 31st, 1884, after examining the body of Doran, I went to the office, and they showed the bobbin to Robinson and myself ; on one edge there was a break in the wood, and there was a stain of blood still fresh and several hairs ; at least four sticking into blood on the

[Taylor v. The Commonwealth.]

rough edge of the wood; the hairs were dark; they were stained with blood."

Several witnesses who were called by the Commonwealth not as experts, but to testify to certain acts of the prisoner and conversations with him, were asked on cross-examination by the defence, whether from what they saw of the prisoner they considered him sane or insane. Objected to. Evidence admitted. (Second and third assignments of error.)

The defence set up for the prisoner was insanity and several experts were produced who testified that in their opinion he was insane. The defence claimed that when Doran came to put Taylor back in his cell, the latter accused Doran of giving him medicine which Doran denied, and called Taylor a liar and struck at him; that then Taylor knocked Doran down with his fist and afterwards struck him with the iron bar not intending to kill him.

The defendant asked the court to charge, *inter alia*, as follows:

3. If the jury find that Taylor was not insane, but if they believe that Taylor struck Doran with his fist, under sudden excitement, and immediately after such striking, and in the continuing excitement, took the iron bar from Doran and struck the blow that caused death, then the verdict can be for no higher grade than murder in the second degree.

*A.* Affirmed. Unless he did strike the blow with a wilful, deliberate, and premeditated intent to kill, as specified in charge. (Twenty-second assignment of error.)

11. If the jury believe the defendant was laboring under a delusion that Doran and the other prison authorities were conspiring to take his life by means of medicines given to him surreptitiously in his tea, coffee, food and water, and that the prisoner was so confined that it was impossible for him to escape from his persecutors, except by refusing to take food and starving himself to death, and in that state of mind he struck Doran, the prisoner is not responsible, and should be acquitted on the ground of insanity.

*A.* This point assumes that which must be found by the jury. The existence of a delusion, unless an insane delusion, is not sufficient. If the delusion was an insane one, then the law is as stated in my general charge. (Twenty-ninth assignment of error.)

The general charge of the court was, *inter alia*, as follows: "If the prisoner, at the time he committed the act had not sufficient capacity to know whether his act was right or wrong, and whether it was contrary to law, he is not responsible. That is, in fact, general insanity, so far as the act in question is concerned [it must be so great in extent and degree as to

blind him to the natural consequences of his moral duty, and he must have utterly destroyed his perceptions of right and wrong. The test in this instance, as you perceive, is the power or capacity of the prisoner to distinguish between right and wrong in reference to the particular act in question]—for although a man may be sane upon every other subject, yet if he be mad, to use an expressive phrase, upon this subject, and so far as the act under immediate investigation is concerned, he thereby loses that control of his mental powers which renders him a responsible being. [The test thus suggested has been adopted by the judges of England, and by the courts of our own state, and is too well settled to be shaken.]

. . . . But suppose that the prisoner was able to distinguish between right and wrong, and yet was laboring under partial insanity, hallucination, or delusion, which drove him to the commission of the act as a duty of overwhelming necessity, is he in such cases responsible for his act?

If the delusion were of such a nature as to induce the prisoner to believe in the real existence of facts which were entirely imaginary, but which, if true, would have been a good defence, he would not be responsible. We, however, desire at this stage of our remarks to refer rather to other delusions than the class thus spoken of, reserving for future consideration our remarks on this branch of the subject. That partial insanity, hallucination, or delusion, coupled with the power of discriminating between right and wrong, is an excuse for crime, was held in the charge of Chief Justice GIBSON, in Commonwealth *v.* Mosler, 4 Barr, 266, where the Chief Justice says: "It (insanity) must amount to delusion or hallucination, controlling his will, and making the commission of the act a duty of overruling necessity." And, again, he says: "The law is, that whether insanity be general or partial, it must be so great as to have controlled the will of its subject, and to have taken from him the freedom of moral action."

We cannot however, leave this branch of the subject to doubt or uncertainty, and our conclusion is, after a somewhat extended investigation of the law, that the proper rule to be adopted on this point is the following:

[If the prisoner, although he labors under partial insanity, hallucination, or delusion, did understand the nature and character of his acts, had a knowledge that it was wrong and criminal and mental power sufficient to apply that knowledge to his own case, and knew if he did the act he would do wrong and would receive punishment; if, further, he had sufficient power of memory to recollect the relation in which he stood to others and others stood to him, that the act in question was contrary to the plain dictates of justice and right, injuri-

ous to others, and a violation of the dictates of duty, he would be responsible.] A man must therefore labor under something more than " a mere moral obliquity of perception," and " a man whose mind squints unless impelled to crime by this very mental obliquity, is as much amenable to punishment as one whose eye squints."

[The jury must, therefore, even though they believe the prisoner labored under a diseased and unsound state of mind, be satisfied that this diseased or unsound state of mind existed to such a degree that, although he could distinguish between right and wrong, yet, with reference to the act in question, his reason, conscience and judgment were so entirely perverted as to render the commission of the act in question a duty of overwhelming necessity.]

But there is another species of delusion entirely distinct from those which we have just considered which is recognized by the law, and which when the jury believe that it clearly exists, will entitle the prisoner to acquittal. I refer to that delusion by reason of which the prisoner commits the act under bona fide belief (which is a delusion) that certain facts existed which were wholly imaginary, but which if true, would have been a good defence.

The judges of England, in answer to the fourth question propounded to them by the House of Lords. Supposing that one labors under partial delusion and is not in other respects insane. " We think he must be considered in the same situation as to responsibility as if the facts with respect to which delusion exists were real. For example: If under the influence of delusion he supposes a man to be in the act of attempting to take away his life, and he kills that man, as he supposes, in self-defence, he would he exempt from punishment.

["If his delusion was that the deceased inflicted a serious injury to his character and fortune, and he killed him in revenge, he would be liable to punishment." It has been objected that our law is defective, " in that it leaves out of the account together the moral faculties of our nature, the sentiment, passion, and emotion."]

If the criticism be a just one, then I can understand how a prisoner who labors under a feeling of jealousy, or is angry, or determines to gratify his revenge, is in one sense insane.

[It is quite possible that a brain in some sense diseased may produce a fit of jealousy, anger or revenge, but the law is, that that species of insanity is crime, and, as such, must be punished.]

[Any other legal doctrine must result in resolving society into its original elements, and compel every man to protect himself.] . . . . .

[It is right to remark, without intending to disturb your right to fix the degree of crime, that in a case in which, if the jury believes a deadly weapon has been used under circumstances of atrocity, and with wilful deliberation and premeditation, and with intent to kill, it is difficult to perceive how a verdict less than that of murder in the first degree could be rendered.]

The grade of offence, however, is for you. If the jury believe the prisoner to have been insane, then the Act of Assembly requires the jury " to find specially whether such person was insane at the time of the commission of the offence, and to declare whether he was acquitted by them on the ground of such insanity."

[Under the Act of Assembly, a jury may pass upon the question of the condition of a prisoner mentally, after they have been charged with the indictment.]

As the evidence produced concerning the mental condition of the prisoner extends down to the present time, I have been requested to charge you :

" If the jury believe that the defendant is now a lunatic, although they may not find him insane at the time of the commission of the act, they should find that he is now a lunatic."

[I desire to say that if you convict the prisoner of any degree of murder, you may also declare as follows :  " We find that upon the trial of this issue the prisoner to be a lunatic ; or, that we find the prisoner upon the trial to have been sane."]

Verdict, guilty of murder in the first degree. A motion for a new trial and in arrest of judgment was refused, and sentence of death pronounced. The prisoner took this writ of error, assigning for error the admission of the Commonwealth's offers of evidence and the answers to points as above noted, and the parts of the general charge included in brackets.

*E. Cooper Shapley* (with whom were *Charles Edward Ingersoll* and *Bertram Hughes*), for plaintiff in error.—A physician as an expert may be asked whether a wound could have been produced with an instrument with which the prisoner was proved to have struck deceased, but not with an instrument concerning which there is not such proof : 2 Best on Ev., § 576 ; People *v.* Rogers, 13 Abb. Pr. N. S., 370. In a criminal case, a witness who testifies to facts within his own knowledge, cannot give his opinion as to sanity, based on such facts : Commonwealth *v.* Wilson, 1 Gray, 337 ; Commonwealth *v.* Fairbanks, 2 Allen, 511 ; Townsend *v.* Pepperell, 99 Mass., 40 ; Hastings *v.* Rider, Id., 625.

*George S. Graham* (district attorney), for the defendant in error.

Chief Justice MERCUR delivered the opinion of the court, April 27th, 1885.

That the plaintiff in error killed Doran, is a conceded fact. It is admitted and clearly proved that he did it with force and violence, and without justification.   When he committed this homicide he was a convict serving a term of imprisonment in the Eastern Penitentiary, and Doran was an overseer therein. Having become angry at the latter for some supposed injury, the prisoner struck the fatal blows in a manner indicating great wickedness and depravity.

Alleged insanity constitutes the ground of defence.   Numerous specifications of error are assigned, yet on the argument they were all presented under a few general heads.   We have given to them that careful examination and consideration which the gravity of the conviction demands.   Most of them present questions so well settled by the authorities that it is only necessary to discuss seriatim a few of them.

If there was any valid objection to the question put to Dr. Huidekoper, covered by the first specification of error, it relates merely to the order of time when it was asked.   His subsequent evidence showed very clearly that the blows were struck with a large spool or bobbin, and also with an iron bar. He made the autopsy on the body of Doran, and described the cuts and injuries found on different parts of his head.   He and Dr. Robinson each testified to the condition of the bobbin indicating its recent use.   They saw that it was slightly fractured, and stains of blood still fresh thereon, and found several hairs sticking therein on the rough edge of the wood.   With such unmistakable evidence of recent use, it was clearly proper to prove that this implement, found near the place where the murder was committed, would produce a wound of the shape of the one found on the back of the head.   The lower edge of that wound was bevelled downwards in a convex form, such as a blow with the bobbin would reasonably produce.   Whether this implement was in fact so used was fairly left to the jury.

When the prisoner was arraigned he pleaded not guilty. Eight days thereafter the jury was called ; he exercised his right of challenge, and permitted them to be sworn.   Complaint is made that after this the court refused to permit the plea of not guilty to be withdrawn, in order to determine the question of the prisoner's present insanity.   This application is so novel that no authority was cited to sustain it.   In refusing it the learned judge said if the jury should find the pris-

[Taylor *v.* The Commonwealth.]

oner to be insane during the trial, but not at the commission of the crime, they might so say in their verdict, and then the court would either delay judgment or stay execution if issued. In view of the time this application was made, the prisoner received all the protection he was entitled to demand. All evidence of insanity when he committed the homicide was admissible under his plea of not guilty. The administration of justice should not be delayed and the regularity of the trial be embarrassed by introducing methods not sanctioned by authority. While one on trial for his life is entitled to all that due protection which the law has wisely thrown around him (Coyle *v.* Commonwealth, 4 Out., 573), yet he cannot be permitted, by cunningly devised side issues, to prevent a just and fair trial on the indictment to which he has previously pleaded.

In fact, the court in its charge to the jury did submit to them to find whether the prisoner was a lunatic at the time of the trial, although they did not find him insane at the time of the commission of the act. So he obtained the full benefit of the question raised, without producing confusion in the regular order of the trial.

Exception is taken to evidence of the opinion of witnesses, not experts, as to the sanity of the prisoner. As those witnesses had first testified to his acts and conversations on which their opinions were based, the evidence was properly received. The jury could decide whether those acts and conversations justified the conclusion the witnesses drew therefrom. We see no reason why this evidence should not be admitted in a criminal, as well as in a civil, case. In either case the ascertainment of the condition of the mind is the object of inquiry.

The question of the degree or extent of unsoundness of mind, necessary to acquit one who has committed a homicide, has so often been considered, that certain rules of law applicable thereto must be considered well settled. Among them may be stated:

1. Moral insanity is not sufficient to constitute a defence, unless it be shown that the propensities in question exist to such an extent as to subjugate the intellect, control the will, and render it impossible for the person to do otherwise than yield thereto.

2. No mere moral obliquity of perception will protect a person from punishment for his deliberate act. The jury should be satisfied with reference to the act in question that his reason, conscience, and judgment, were so entirely perverted as to render the commission thereof a duty of overwhelming necessity.

3. Another species of delusion is this: If the prisoner

[Anewalt v. Hummel.]

commits the act under a fixed bona fide belief which is a delusion, that certain facts existed which were wholly imaginary, but which, if true, would have been a good defence, and the jury are satisfied that such delusion clearly existed, it will entitle the prisoner to an acquittal: Sayres v. Commonwealth, 7 Norris, 291.

While a slight departure from a well balanced mind may be pronounced insanity in medical science, yet such a rule cannot be recognized in the administration of the law when a person is on trial for the commission of a high crime. The just and necessary protection of society requires the recognition of a rule which demands a greater degree of insanity to exempt from punishment.

All questions of fact arising in the case were submitted to the jury in a full, adequate, and careful manner. The charge contains a clear and correct statement of the law. No portion thereof, nor of the answers to the points, is in conflict with the law as we have stated it, nor with any other well settled rule applicable to the case.

The able and zealous argument of the counsel for the prisoner fails to sustain any one of the specifications of error.

Judgment affirmed. It is further ordered that the record be remitted to the court below for execution.