# Commonwealth of Pennsylvania *v.* Calhoun, Appellant.

*Criminal law—Murder—Defense of insanity—Court and jury—Examination of jurors—Expert testimony—Instructions to jury—Burden of proof—Points for charge.*

1. A trial court is not obliged to charge a point which suggests theories not reasonably sustainable by the evidence.

2. In a trial upon an indictment for murder counsel may not examine a proposed juror upon his understanding of the law; he may be asked the broad question whether, if sworn as a trier, he would accept and act upon the law as stated to him by the court; and this is as far as the examination on the voir dire may properly proceed along that line.

3. A conviction in a criminal case will not be reversed because of a slight inaccuracy in the judge's statement of the testimony, especially where counsel does not call attention to the mistake at the time.

4. In a homicide case the burden of proof of insanity is with the defense from the beginning and is never shifted.

5. The defense of moral insanity or irresistible impulse can only be recognized in the clearest cases, where it is shown to have been habitual, or at least to have evinced itself on more than a single instance. To establish it as a justification in any particular case it is necessary either to show, by clear proof, its contemporaneous existence by present circumstances, or the existence of an habitual tendency developed in previous cases, becoming in itself a second nature.

6. Proof that insanity has existed at any indefinite time in the past does not raise the presumption in law, sufficient to excuse a homicide, that it continued up to the time of the committing of the crime at some subsequent date; much clearer proof of insanity at the time of the commission of the deed is required.

7. Proof of the existence of delusions of a character that "might produce" an irresistible impulse to take life is insufficient to excuse a homicide, without proof that the delusions were of a character that would have a tendency to produce such an irresistible impulse.

8. Upon the trial of an indictment for murder, where the defense relied upon was insanity in the form of delusions of oppression and threats against the defendant's life which produced homicidal mania at the time of the killing, it appeared that the defendant had been a boarder at the home of the deceased, who had ordered him out of the house a short time before the homicide; that a few days prior to the shooting the defendant had borrowed a gun and on the afternoon of the shooting he had returned to the residence of the deceased and deposited the gun on the porch; that in the evening the deceased upon opening the door in response to a rap was shot in the head by the defendant who stood on the outside with the weapon in his hand. The defendant in a voluntary confession said that he had committed the deed because the deceased had treated his own wife badly and had threatened defendant's life. There was testimony that the defendant had had improper relations with the wife of the deceased. The defendant testifying in his own behalf said that he did not remember what he did after taking up the gun and that his first realization that he had killed the deceased came at a later time, and also that he did not know just what he had in mind when he entered the yard. He testified further that the so-called threats all antedated the killing, and he did not say that at the time of the homicide he had any immediate hallucinations or that he was forced by an irresistible impulse to kill deceased. The evidence depended upon to show insanity tended to show that the defendant

was melancholy by nature and from time to time imagined that others wanted to harm or to kill him; but that he was normally a mild-mannered man who did not attempt harm. There was no testimony that his alleged delusions had in the past ever impelled him to attempt to punish, much less to kill, his supposed enemies, and the only testimony concerning homicidal tendencies was that of an expert witness who testified that "many cases of paranoia have homicidal tendencies." *Held,* a verdict of guilty of murder in the first degree was justified.

9. In such a case the judgment will not be reversed because of alleged error based upon detached abstracts from the charge where it appears that when these excerpts are read into the whole charge the defendant has not just ground for complaint.

10. In such a case it is not reversible error for the court to have permitted an expert witness called by the Commonwealth to testify to his opinion as to defendant's insanity, although the witness had not heard the direct examination of the defendant or the depositions of witnesses who described his condition at a period prior to the commission of the crime, where the testimony actually adduced merely amounted to an expression of opinion on the mental state of the defendant at the time of the trial; and this is particularly true where the witness was not called as a principal or leading expert, and it is not probable that his testimony exercised any controlling weight in determining the verdict.

Argued October 28, 1912. Appeal, No. 328, Jan. T., 1912, from judgment of Court of Oyer and Terminer of Huntingdon County, May Sess., 1912, No. 1, on verdict of guilty of murder in the first degree in case of Commonwealth of Pennsylvania v. Frank M. Calhoun. Before BROWN, MESTREZAT, POTTER, ELKIN and MOSCHZISKER, JJ. Affirmed.

Indictment for murder. Before WOODS, P. J.

The circumstances of the killing are stated in the opinion of the Supreme Court.

During the examination of jurors on their voir dire the following questions were asked:

Q. (Mr. Henderson.) Mr. Brown, murder is defined to be as follows: "Murder is where a person of sound memory and discretion unlawfully killeth another human creature in being against the King's Peace with

malice aforethought, either express or implied." What do you understand by the words "A person of sound memory and discretion."

Mr. Williamson: This question is objected to as improper.

The Court: I don't think it is a proper question. The court will explain this. Bill sealed for the defendant. [1]

Q. (Mr. Bailey.)   Mr. Zeigler, if the testimony by its weight will satisfy you that at the time this homicide was committed that the accused was laboring under a mental disease of insanity, either partially or general, creating in his mind an irresistible impulse or desire to take life, and while under the controlling force or power of that impulse he did take life, would you deem him legally responsible for his act?

Question objected to by Mr. Williamson.

The Court: Objection sustained, question overruled, and seal a bill for the defendant. [2]

*Errors assigned* were (1 and 2) rulings in the examination of jurors; (4-7, 9, 10) portions of charge; (11-15) answers to points.

*Thomas F. Bailey* and *Howard L. Henderson,* for appellant.—The questions to the jurors on their voir dire should have been allowed: Hall v. Com., 22 W. N. C. 25; Com. v. Curcio, 218 Pa. 327.

The evidence of the experts on the question of insanity was improperly admitted when they had not a full knowledge of the facts: Yardley v. Cuthbertson, 108 Pa. 395; Coyle v. Com., 104 Pa. 117; McDyer v. Eastern Penna. Railways Co., 227 Pa. 641.

The instruction of the court on the question of insanity was erroneous: Ford v. State, 35 L. R. A. 117 (73 Miss. 734) ; Shaver v. McCarthy, 110 Pa. 339; Com. v. Molten, 230 Pa. 399; Com. v. Gerade, 145 Pa. 289; Com. v. Greene, 227 Pa. 86; Com. v. Deitrick, 221 Pa. 7; Com.

v. Sayars, 21 Pa. Superior Ct. 75; Com. v. Frucci, 216 Pa. 84.

The instruction with regard to his defense was erroneous: Com. v. Lee, 226 Pa. 283; Com. v: Molten. 230 Pa. 399.

*Charles C. Brewster,* District Attorney, and *Richard W. Williamson,* Assistant District Attorney, for appellee.—The exclusion of the questions asked the jurors on their voir dire was proper: Hall v. Com., 22 W. N. C. 25.

The rulings and instructions of the court on the question of insanity were correct: Com. v. Barner, 199 Pa. 335; Com. v. Wireback, 190 Pa. 138; Rouch v. Zehring, 59 Pa. 74; Rambler v. Tryon, 7 S. & R. 90; Bricker v. Lightner, 40 Pa. 199; Com. v. Mosler, 4 Pa. 264; Com. v. Lewis, 222 Pa. 302; Com. v. Hallowell, 223 Pa. 494; Com. v. Woodley, 166 Pa. 463; Sayres v. Com., 88 Pa. 291.

OPINION BY MR. JUSTICE MOSCHZISKER, January 6, 1913:

The defendant, Frank M. Calhoun, a man about fifty years old, shot and killed Benjamin Galloup on the night of December 16, 1911. Calhoun had been a boarder in the home of the deceased, who had ordered him out of the house a short time before the homicide. Several days prior to the shooting the defendant borrowed a gun from a member of the Galloup family, and on the afternoon of December 16th he returned to the residence of the deceased and deposited the gun on the porch; that evening a rap came at the door, and as soon as Galloup opened it he was shot in the head by the defendant, who stood on the outside with this weapon in his hand; Calhoun was arrested; at first he refused to make any admissions, but soon made what the Commonwealth proved to be a voluntary confession, in which he said that he committed the deed because Gal-

loup had treated his wife (Mrs. Galloup) badly and had threatened his, the defendant's life. The theory of the Commonwealth was that a breach had occurred between the murdered man and his slayer, caused by the discovery of the latter's improper relations with the former's wife; and there is positive testimony in the case that late in September or early in October, 1911, the defendant accompanied Mrs. Galloup to a neighboring town, where they stayed over night occupying a room together as man and wife.

The prisoner took the stand in his own behalf and told a long detailed story of his life from boyhood down to the time of the killing, but when he came to that important event he stated, "I remember going into Mr. Galloup's yard......I remember going up to the porch, and I remember picking up the gun...... I do not remember after that what I done." He was then asked the question, "What is your first recollection now after picking up the gun?" and he replied, "I could not say. I don't know." The defendant later said that his first realization that he had killed Galloup came when told by the mayor of Huntingdon that seven or eight people had seen him do the deed; the witness was then asked what he had in his mind when he entered the yard just prior to the killing, and said, "I don't know just what I had in mind when I entered the yard......" On cross-examination he said that he went in the back way and picked up the gun, and then the question was put to him, "There your mind ends?" and he replied, "There is a blank to me. Yes." The defense, as we understand it from the contentions of counsel, was insanity in the form of delusions of oppression and threats against the defendant's life which produced homicidal mania; but Colhoun when upon the stand testified that the so-called threats all antedated December 16th, 1911, and he did not say that at the time of the homicide he had any immediate hallucinations or that he was forced by an irresistible impulse to kill Galloup; as

just shown, his testimony was that he did not realize the nature of the act he was committing,—that he actually did not know that he was doing the deed at the time of the shooting. The evidence depended upon to show insanity was that of the prisoner himself and the written depositions of five persons in the west who had known him before he came to Huntingdon in August, 1911, together with the testimony of two doctors called as experts. The lay witnesses testified that the defendant was peculiar and melancholy by nature and from time to time imagined that others wanted to harm or to kill him; but that he was normally a mild-mannered man who did not attempt harm, and when he suspected that anyone was going to injure him he habitually moved to another neighborhood. One of the witnesses, a relative who had known the defendant for about fifteen years, said, "I would not call him a purely insane man. He was insane to a certain extent; but he really didn't have his own mind." Another relative who had known the defendant all his life stated, "At times he was apparently perfectly sane." None of the witnesses from the west had any personal knowledge through contact with Calhoun for about eighteen months before the date of the murder, and no one was called to prove insanity who had associated with him after he came east. There was no testimony that the alleged delusion that others wanted to kill the defendant had in the past ever impelled him to attempt to punish, much less to kill, his supposed enemies; and when his chief medical expert was asked, "Is this disease of such a nature and are the delusions of such a character as might readily produce a homicidal mania?" he replied, "Many cases of paranoia have homicidal tendencies." This reply is the nearest and practically the only testimony we find in the case concerning homicidal tendencies in any direct connection with the defendant. When this witness was asked specifically whether the alleged disease from which he said the de-

fendant suffered would be diagnosed as "partial insanity" or "total insanity," he did not give a responsive answer. In point of fact, the evidence would not justify a finding that the defendant had in the past suffered from total insanity (sometimes described as general, habitual or fixed insanity) or from partial insanity accompanied by a homicidal tendency. In rebuttal, the Commonwealth produced a number of persons who had worked or associated with the defendant since his arrival in Huntingdon, and who testified that they believed him to be sane; medical testimony to the same effect was also produced.

The first two assignments of error concern the examination of proposed jurors on their voir dire. Counsel for the defendant stated the common law definition of murder to one of the jurors, and then asked, "What do you understand by the words, a person of sound memory and discretion?"; another was asked, if the testimony satisfied him that the accused was insane at the time of the crime and had committed the deed while under the control of an irresistible impulse to take life, "Would you deem him legally responsible for his deed?" The trial judge was clearly right in refusing to allow either of these questions. Counsel may not examine a proposed juror upon his understanding of the law, and that is what these interrogations amounted to. One called to the book as a juror may be asked the broad question, whether, if sworn as a trier, he would accept and act upon the law as stated to him by the court; and this is as far as the examination on the voir dire may properly proceed along that line. (On this general subject, see Hall v. Commonwealth, 22 W. N. C. 25.)

The third assignment complains that error was committed in receiving the testimony of a doctor called by the prosecution. This witness testified that he had examined and interviewed Calhoun at the prison on two occasions and had heard his cross-examination, but he made it plain that he had not heard his direct examina-

tion or the depositions of the witnesses who described
the defendant's condition prior to the time he came to
Huntingdon; then this question was put,—"Taking his
history as related by him, coupled with your examina-
tion of this defendant upon the visits which you made
to him, what in your opinion have you to' say in respect
to whether the defendant was sane or insane when he
committed the offense on the 16th of December last?"
The question was followed by a lengthy objection from
counsel for the defense, the court's ruling thereon and
the allowance of an exception, after which the witness
replied, "I believe him to be sane." He was then asked
specifically what his opinion was as to the condition
of the defendant at the time of trial, and after inquiries
to make certain that he understood the question, he
answered, "I think he is sane." It is clear that the wit-
ness, unintentionally or otherwise, did not give a re-
sponsive answer to the first question propounded to
him; both of his replies relate to the mental condition
of the defendant at the time of the trial and not the
time of the homicide; hence, no good purpose would be
served by discussing the several points urged by counsel
concerning the rules governing the examination of ex-
perts called to give opinions, founded on a series of
stated or assumed facts, concerning the mental condi-
tion of an accused at the time of an offense. Here the
testimony adduced merely amounted to an expression
of opinion on the mental state of the defendant at the
time of the trial, founded upon the witness's conversa-
tions with the accused and observation of him while in
prison and during his cross-examination; as it appears
upon the record, we see no error in the admission of
this evidence. The witness was not called by the Com-
monwealth as a principal or leading expert, and his tes-
timony was most brief; whether or not it was urged be-
yond its legitimate scope does not appear, but consider-
ing the whole body of the evidence, it is not probable
that it exercised any controlling weight in determining
the verdict.

In the fourth, fifth, sixth, seventh and ninth assignments the appellant complains of detached abstracts from the charge. We agree with the trial judge, that "When these excerpts are read into the whole charge ......the defendant has no just ground for complaint"; and that is the test to apply: Commonwealth v. Johnson, 133 Pa. 293, 305. In reference to the specific legal questions raised by these assignments: the instruction that "the insanity which constitutes the defense must be shown to have existed at the time the act was committed," was entirely correct: Ortwein v. Com., 76 Pa. 414, 424; Coyle v. Com., 100 Pa. 573, 579. The use of the word "idiotic" was inapt, but this was immediately followed by other words appropriate to the defense, and when the portion of the charge in question is taken as a whole, it is clear that the jury could not have been misled by the word complained of. In view of the testimony given by W. C. Calhoun, one of the witnesses for the defense, to the effect that the defendant occasionally had "fits of anger" and at such times "would commit acts that no sane man would commit," the statement that "transitory frenzy" was not recognized in the criminal law of Pennsylvania as a defense to murder (Com. v. Renzo, 216 Pa. 147, 149), was not inappropriate. The instruction that if the jury were satisfied by the fair preponderance of the evidence that the defendant did the killing "without knowing what he was doing" they should acquit on the ground of insanity, but "if, on the other hand, the evidence does not so satisfy you," he should not be acquitted, was entirely appropriate and correct; and this is particularly so, in view of the testimony of the defendant that he did not know what he was doing at the time he fired the shot. It is not necessary to cover every possible element of a defense at one time; in other parts of the charge the trial judge told the jury that if the defendant's mind was so affected that he did not appreciate the nature and consequence of his act or realize that it was wrong, he should be ac-

quitted; he particularly instructed that if they believed the defendant had an irresistible impulse to commit the crime,—that "he was impelled by an impulse or a spell, ......or delusion that he had no power whatever to resist," they should acquit him; and almost the last words uttered were the affirmance of one of the defendant's points which instructed,—"even if the jury believe that the prisoner could distinguish at the time the crime was committed the difference between right and wrong; yet, if they further believe that, with reference to the particular act for which he is now on trial, his reason, conscience and judgment were so entirely perverted as to render the commission of the act a duty of overwhelming necessity, then this state of mind would excuse the crime and the defendant would not be guilty of murder." Under these circumstances, the appellant's contention that the charge was inadequate in that it did not sufficiently instruct upon moral insanity or irresistible impulse, cannot be sustained. Before leaving the consideration of this particular complaint, it may be well to note that the defendant did not say that he suffered from a distinct impulse to commit the act, and there was not sufficient testimony to show a present existing or a past habitual tendency to homicidal mania; in Com. v. Mosler, 4 Pa. 264, 267, GIBSON, C. J., stated, "The doctrine which acknowledges this mania is dangerous in its relations, and can be recognized only in the clearest cases. It ought to be shown to have been habitual, or at least to have evinced itself on more than a single instance...... To establish it as a justification in any particular case it is necessary either to show, by clear proof, its contemporaneous existence by present circumstances, or the existence of a habitual tendency developed in previous cases, becoming in itself a second nature"; also see Coyle v. Com., 100 Pa. 573, 578, and Com. v. Hillman, 189 Pa. 548, 557. We do not think that the instruction, if the defendant went to Galloup's house with a deliberate intention to kill him he

would be guilty of murder in the first degree, was error, when taken in connection with the direction which immediately followed to the effect that, if the jury found "the defendant was insane at the time the act was committed," the "verdict should be not guilty by reason of insanity."

The eighth assignment calls attention to an immaterial error on the part of the trial judge in misstating the name of a witness in connection with certain testimony. A conviction in a criminal case will not be reversed because of a slight inaccuracy in the trial judge's statement of the testimony, especially where counsel does not call attention to the mistake at the time: Com. v. Swift, 44 Pa. Superior Ct. 546.

The tenth assignment complains of the instruction, "If the evidence clearly establishes the killing of the deceased purposely with a deadly weapon an illegal homicide of some kind is established and the burden then falls on the prisoner and not on the Commonwealth to show that it was excusable, if, then, his extenuation is in doubt, he cannot be acquitted of all crime, but must be convicted of homicide in some one of its grades." These are almost the exact words of Commonwealth v. Drum, 58 Pa. 9, 22; the rule there laid down always has been and still is the law of Pennsylvania as applied to the plea of insanity and other affirmative defenses in criminal cases: Ortwein v. Com., 76 Pa. 414, 425; Lynch v. Com., 77 Pa. 205, 213; Com. v. Gerade, 145 Pa. 289; Com. v. Wireback, 190 Pa. 138, 151; Com. v. Heidler, 191 Pa. 375, 378; Com. v. Barner, 199 Pa. 335, 344. See also, Com. v. Palmer, 222 Pa. 299; Com. v. Molten, 230 Pa. 399; Com. v. Colandro, 231 Pa. 343.

The eleventh, twelfth, thirteenth and fourteenth assignments all go to the answers given to requests for instructions submitted by the defendant, and may be considered together. In these points the trial judge was asked to tell the jury that "when habitual insanity is

once proven to have existed," it is presumed to continue and the burden of proof that the accused was sane at the time of the commission of the crime is cast upon the Commonwealth; next, that if the jury believed that the defendant suffered from delusions of threats against his life and that they were "permanent, continuous and fixed" and of such a character as "might produce" an irresistible impulse to take life or that his mental condition was such as "might" drive him irresistibly to the deed, then the burden was shifted to the Commonwealth to show that he was in a normal state of mind at the time of the homicide, and in the absence of such proof or of "any apparent sufficient motive for the killing," the defendant could not be convicted of murder. The requests were all refused; but in answering them the trial judge again told the jury, "In order to excuse one who has committed the crime of murder, on the ground of insanity, it must be shown by fairly preponderating evidence that at the time when he committed the act his mind was so affected by disease that he did not know the nature and consequence of his act, or if he did know the nature and consequence of it, then he didn't know that it was wrong and would be punished by law, or that he was so impelled by an impulse that he had no power whatever of resisting, and the burden of proof is upon him." Many reasons justify the refusal of these requests, and the answer (in accord with the law, Com. v. Hallowell, 223 Pa. 494, 504), could have done the defendant no harm. It has never been held in our criminal jurisprudence that when insanity is proved to have existed at any indefinite time in the past, it is presumed in law to continue up to the time of the commission of a crime at some subsequent date; much clearer proof of insanity at the time of the commission of the deed is required in order to excuse a homicide: Com. v. Mosler, 4 Pa. 264, 267; Coyle v. Com., 100 Pa. 573, 578; Com. v. Hillman, 189 Pa. 548, 557. Nor have we held that proof of the existence of delusions of a character that "might

produce" an irresistible impulse to take life was sufficient; it must be shown that the delusions were of a character that would have a tendency to produce such an irresistible impulse: Com. v. Mosler, Coyle v. Com. and Com. v. Hillman, supra. More than this, the points as drawn inferentially assumed that the Commonwealth failed to show motive or to produce evidence from which the jury might find that the defendant was sane at the time of the homicide, whereas the fact was quite to the contrary, although no such express proofs were required (Com. v. Danz, 211 Pa. 507, 516; Com. v. Buccieri, 153 Pa. 535, 544; Com. v. Wireback, 190 Pa. 138, 151). But in addition to the reasons already stated, we have distinctly ruled in Pennsylvania that in a homicide case "the burden of proof of insanity is with the defense from the beginning and is never shifted" (Com. v. Heidler, 191 Pa. 375); and all of the requests might have been properly declined upon that ground alone.

The last assignment relates to the refusal to affirm the following request for charge: "The proof of insanity, whether general or partial, need not be positive, but if the jury are satisfied by the weight of the evidence that the defendant was suffering, at the time he committed the homicide, from a delusion that the deceased intended to take his life, and that he believed it was either his life or that of the deceased, there can be no conviction of murder." There was no evidence of permanent general insanity, as that term is understood in the law (Com. v. Mosler, 4 Pa. 264, 266); and from the answer to the request and the charge as a whole the jury must have understood that it did not require positive proof to establish insanity in any of its forms. The point is faulty so far as it relates to partial insanity, in that the limiting expression, "he believed that it was either his life or that of the deceased," is too general and indefinite to comprehend a state of facts, imagined by the defendant, sufficient to excuse the homicide on the ground of hallucinations;

and it does not suggest the absolute necessity for the alleged delusion to have so operated on the mind of the accused as to have caused him to kill for his own supposed protection. In order to acquit on the theory suggested in the point, the jury would have had to find from the fair preponderance of the evidence that the defendant believed (though a delusion) that a certain state of facts existed at the time which, if true, would have justified the killing, or, at least, would have justified the thought on his part that the deed was necessary to preserve his own life, and that this belief impelled him to the homicide (Taylor v. Com., 109 Pa. 262, 270; Com. v. Hallowell, 223 Pa. 494); yet it could not reasonably be inferred from the evidence (particularly in connection with the defendant's own testimony that his mind was a blank), that at the time of the fatal shot the accused had a "fixed bona fide" belief that he was about to be attacked by Galloup or that he believed any distinct state of facts to be then present "which if true would have been a good defense" to the killing of the deceased (Sayres v. Com., 88 Pa. 291, 298, 299). Thus it appears that in addition to its other fault, the request was inapplicable to the proofs; the court was not obliged to charge a point which suggested theories not reasonably sustainable by the evidence: Com. v. Gibson, 211 Pa. 546. We conclude that the trial judge was justified in declining the request as drawn; and the language employed in so doing gave a correct statement of law which could have done the defendant no harm.

A review of the entire record fails to show any substantial error; the trial judge was just, even liberal, to the accused in his rulings on the evidence and in the manner in which he submitted the case. In the general charge and in the answers to points the most oft-repeated and amplified instruction was to the effect that the prisoner had made out a defense that called for an acquittal, if the jury found from the fair preponderance of the evidence that at the time of the homicide he was

so mentally deficient that he did not know what he was doing or that he did not realize the nature or appreciate the consequences of the act he was committing; and this, considering the evidence as a whole, including the defendant's claim of a momentary total mental lapse, was the instruction which precisely fitted his case; but in addition, all other phases of insanity suggested by the proofs were amply and correctly covered.  Finally, after reading the testimony we are not convinced that a wrong verdict was reached.  Under the proofs, the jury might have concluded that the defendant was not intellectually strong, or even that he was to a degree afflicted with mental weakness, yet that he appreciated the relation in which he stood to others, that he had the power to distinguish between right and wrong, that he knew the nature of the act he was about to commit and that it was wrong and against the law; or they might have found that the defendant had had delusions in the past but at the time of the homicide he was not suffering from hallucinations which deluded him into the belief that he had to kill the deceased in order to preserve his own life, and that he was not impelled to the deed by an irresistible impulse; these conclusions would justify the verdict: Com. v. Mosler, 4 Pa. 264, 266; Taylor v. Com., 109 Pa. 262, 271; Com. v. Heidler, 191 Pa. 375, 376, 377; Com. v. Hallowell, 223 Pa. 494, 504; Hall v. Com., 22 W. N. C. 25, 27.  Again, the jury may have refused to believe in the defendant's alleged insanity or delusions altogether; they may have ascribed the killing to a passion of resentment against the deceased, and such a condition of mind is not sufficient to excuse a homicide, even when it operates upon one not mentally strong: Sayres v. Com., 88 Pa. 291, 301; Lynch v. Com., 77 Pa. 205, 213.

The assignments are all overruled, the judgment is affirmed and the record is remitted for the purpose of execution.