# Commonwealth of Pennsylvania *v.* William Hillman, Appellant.

*Murder—Insanity—Homicidal mania—Charge of the court.*

To establish homicidal mania as a justification in any particular case it is necessary, either to show by clear proof its contemporaneous existence, evidenced by present circumstances, or the existence of an habitual tendency developed in previous cases, becoming in itself a second nature.

In a murder trial the court was asked to charge that " if the jury believe that the prisoner at the time of killing was so disordered mentally as, while intellectually comprehending right and wrong, and knowing the killing of her to be forbidden and punished by law, to be unable to adjust his conduct to the law and avoid that forbidden thing, he is not responsible, at least to answer for the higher grade of murder." *Held,* that it was not error to say in reply to the request that " if the mental condition of the defendant was such that he could not consciously form the purpose to kill and deliberately execute that purpose, he is not guilty of murder in the first degree."

On the trial of an indictment for murder the prisoner's mother and sister, his two brothers and his uncle testified that before the murder he was subject to frequent attacks of epileptic fits which had affected his mind, and that they regarded him as insane. Two physicians who had no knowledge of the prisoner's condition before the murder testified that in their opinion he was insane. Several of the prisoner's neighbors testified that they were well acquainted with him and never saw anything in his conduct suggestive of insanity. It was undisputed that he had done the killing charged in the indictment, and he had, a few days previous to committing the deed, purchased the revolver and cartridges which he used. *Held,* that a judgment on a verdict of murder of the first degree should be sustained.

Argued Nov. 14, 1898. Appeal, No. 168, Oct. T., 1898, by defendant, from judgment of O. and T. Allegheny County, March T., 1898, No. 25, on verdict of guilty of murder of the first degree. Before GREEN, WILLIAMS, McCOLLUM, MITCHELL, DEAN and FELL, JJ. Affirmed.

Indictment for murder.

The facts appear by the opinion of the Supreme Court.

The court charged in part as follows :

The charge in this case is murder, the highest grade of offense in our calendar,—murder, the killing of a human being. There

are several grades of homicides, there is murder and voluntary manslaughter. Murder is defined as the unlawful killing of another with malice aforethought. Manslaughter is the unlawful killing of another without malice. Malice, therefore, distinguishes the grade of murder from manslaughter. To give you an illustration: If two men are engaged in a fight, and in the heat of blood one kills the other, it is manslaughter, because, in such a case, there is not that malice that makes the crime murder; or if a person, under a very strong provocation, in the sudden impulse of the moment kills another, it is called manslaughter, in the absence of what is called malice in law. Malice, in the common acceptation, means spite, ill-will, hatred or revenge. Malice in law means a depraved and wicked heart that is reckless and disregards the rights of others. Reckless conduct that results in the death of another is malice. To illustrate that: If a man fires a gun into a crowd and kills another it is murder, because the fact of the reckless shooting of a gun into a crowd is malice in law. That wicked and depraved disposition and that recklessness and disregard of human life is malice. In the case I have referred to, if the man shoots into the crowd and has no specific intention to kill anybody, it is murder, but murder of the second degree.

[In the early days of our jurisprudence in this state our legislature divided murder into two degrees. It was not the case in England, from which we came. There all murder was punished with death; but, as I have said, in the early days of jurisprudence in this state our legislature divided murder into two degrees, one called murder in the first degree, and the other murder in the second degree. The statute says that where the unlawful killing is effected by lying in wait, or by poison, or in the commission of a felony, it is murder in the first degree; and also that any wilful, deliberate and premeditated killing is murder in the first degree. Wilful, that means voluntary, not under compulsion; premeditated means that it is determined upon beforehand; deliberate means executed in pursuance of the previously formed purpose to kill. The specific intention to take life, therefore, distinguishes murder in the first degree from murder in the second degree.] [2]

Now, to illustrate the difference, take this case that we are trying. If the defendant bought a revolver with the intention

of using it in killing Bertha Spiegel, loaded it and went to the house, and used that revolver, shooting her, for the very purpose of carrying out his previously formed purpose, it would be murder in the first degree.  If he had no intention of killing her while there—had formed no previous intention to kill, but, when there, shot in order to wound her, or to scare her, or something of that kind, it might be murder in the second degree.

Manslaughter, as I have said, is an unlawful killing without malice.  The evidence here, gentlemen, if believed by the jury, would point to murder, rather than to manslaughter.

[While it is the duty of the commonwealth to establish, beyond a reasonable doubt, every essential element of a crime, it is not necessary, in all cases, to prove a motive for the commission of a crime.  Sometimes parties have a secret motive in the mind, which it would be hard to ascertain.  Therefore it is not necessary in all cases that the commonwealth should establish the motive of the party in committing the crime; but that can often be, and most usually is ascertained from the circumstances in the case.  The commonwealth, however, suggests a motive for the killing in this case, that it was either through jealousy or revenge.  It seems that the defendant had been paying some attention to this girl, Bertha Spiegel.  He had frequently been at the house of the grandfather, where she lived.  She was a girl not quite fifteen years of age, and he was something over thirty years old.  They lived, I believe, within less than a mile apart. He had been working sometimes for the old grandfather of the deceased, and sometimes called there; but, according to the evidence of the old lady, the grandmother, she had told him that the mother of the girl was not satisfied with his attentions to the girl, and I think she said that he might come there to the house, but not come to see Bertha.  The uncle of the defendant, at one time, went with him to the house to ascertain if there were any objections to him, or what had been said about him, plainly intimating that he knew, or suspected, that there were some objections to him; and I think there is some evidence on the part of one witness that in a conversation something was said about whether she was receiving letters from anybody, and I think the old grandmother said that she was not.  Then the brother of the deceased testified that in a conversation with the old lady, the grandmother, when she intimated that he ought

not to be paying attention to Bertha, he muttered to himself to the effect that " If I don't get her, nobody else shall." I do not pretend to repeat the precise words, but if I misstate the meaning, gentlemen, correct me. The old gentleman, the grandfather, testifies that on the night when he came there he used an expression of this kind, after asking where she was, that he would make an end of it now ; some remark of that kind. If you believe this testimony, gentlemen, it would indicate and point either to a feeling of jealousy or a feeling of revenge on his part.] [3]

The facts of the case, gentlemen, on the part of the commonwealth are not really controverted by the defendant, that on the 29th day of March of this year he called in the evening; that he had called in the forenoon at the house of the old grandfather, where the girl was, and, according to the grandfather's statement, he had a conversation with her on the porch in the forenoon for an hour or so. He did not hear what they were talking about. He called again in the afternoon, and was there some time talking to the girl ; and he said he called when the girl was out milking ; whether or not that was a third call that day, I will not say ; but, then, after that he came over about 7 o'clock, or after 7 o'clock ; came into the kitchen where the old gentleman was (a very feeble old gentleman, as you could see when he was on the stand), and asked where Bertha was. He told him that she was upstairs putting the children to sleep. He went to the foot of the stairs and called her to come down. She came down, and, according to the old gentleman's testimony, he took hold of her and shot her once with the pistol, and then by the door, and then dragged her or forced her out of the kitchen into the yard, and I think the old gentleman said the pistol went off once or twice in the yard. Then he dragged her out to the barn, a distance of some ninety feet. The old gentleman said she was trying to get clear, and said, " Bill, don't;" some remark of that kind to Bill, meaning the defendant. The old gentleman followed out to the barn, and saw him beat her on the head; she was down on the ground. After the defendant left, the old gentleman dragged and carried her back into the kitchen, and she lay on the floor, rolling about all night, bloody, unconscious. The old gentleman remained there, because there was no grown person about the

house except himself; his wife was in the city, and the three children were all small, and the old gentleman said he had no means of sending to anybody, and he remained there during the night, he said, keeping up the fire, as it was rather cold; and the girl was moaning and rolling over the floor, sometimes trying to get up on her feet during the whole night. Sometime in the forenoon or the next day some neighbors called there, and found her in this condition, and brought down a bed from the upstairs, and put her on the bed. She was unconscious and covered with blood, and died on that evening. The doctors who conducted the post mortem examination said there was one ball had entered the side, and lodged in the lobe of the lung; another ball broke the lower jaw, and another ball made a flesh wound on the shoulder; and besides that, the skull was fearfully cracked, and when the skull was removed the brain was found to be clotted with blood, and they said she died from the wounds, more especially those on the head.

This was on Tuesday, the 29th day of March. On the previous Friday, the 25th of March, the defendant had gone to the store of Mr. Fowler, who was living in the neighborhood, and had bought the pistol given in evidence here, and a box of cartridges. He went back the next day, on Saturday, the 26th, to exchange the cartridges. The ones he had gotten did not fit the pistol, or were of a different kind, and they were exchanged for a different kind of cartridge. This pistol was found on the table in the house of the defendant; after the violence upon the body of Bertha Spiegel he returned to his home, and the next morning was found there with his throat cut, but not severely, not fatally.

Now these essential facts are not controverted by the defendant. The counsel for the defendant, in addressing you, admitted that the defendant was the cause of the death of Bertha Spiegel, and that he caused her death in the way I have indicated, according to the testimony in this case. The defense is insanity. Every man is presumed to be sane, and insanity, as a matter of defense, must be established by the defendant. It is the duty of the defendant to prove insanity. If it is established, then the commonwealth should reply to it. That has been done in this case, and now the question arises under this evidence, was the defendant insane at the time he com-

mitted this killing? Is he responsible for the killing? Or is he excused for the killing by reason of insanity?

Insanity, as a defense, is an established principle of law. Whenever the party doing the killing was insane at the time of the killing, it is an excuse for that killing, and the party is not criminally responsible. It is impossible to give a definition of insanity that will apply to all cases. There are various kinds of insanity, and each kind requires a different definition or description. Idiocy is where the individual from birth was destitute of reason, and incapable of discriminating between right and wrong. Delusion is where a strange and unaccountable idea possesses a man, as, for example, when he imagines he is not himself, but some other person; or, without any cause, imagines that some person intends to kill him, or do him great bodily harm. Dementia is a derangement of the intellectual faculties, or loss of mental power, generally resulting from a disease of the brain. Mania, a violent derangement of the brain, generally expressed by saying that he is a maniac. Monomania is where the person is insane on one subject, but rational on all others. Homicidal insanity is another kind, generally described as an irresistible inclination to kill; when the person is utterly unable to control his will and intellect, and is not actuated by a malicious spirit, or by anger, jealousy, revenge, or any other evil passion, and does not know at the time that he is doing wrong. There is no arbitrary rule or fixed standard for determining the question of sanity or insanity in all cases. Much depends upon the character, disposition, habits of life, and mental traits of the individual. What might be regarded as insane conduct in one man might be perfectly natural in another. A spendthrift, that is, one who is naturally reckless and extravagant, may waste his estate in extravagance and dissipation; he would be called a fool but hardly insane. But if a man of known penurious and miserly habits should suddenly become a spendthrift, it would be evidence of his insanity. One man may be of a violent temper, given to sudden outbursts of passion, be morose, sullen, revengeful; but if it is his natural disposition, these acts would be little, if any, evidence of his insanity. On the other hand, if a man of gentle nature, kind-hearted, quiet, and of a cheerful disposition, should suddenly change his whole character, and become violent in his language and conduct, or

become morose, sullen, revengeful, these acts would be evidence that he had become insane.

[The insanity which excuses for the commission of a crime is not mere weakness of intellect; it is not ignorance and stupidity; it is not depravity of heart; it is not a violent temper and revengeful spirit; it is not a debased, wicked and brutal nature. The insanity which excuses for a crime is such as overthrows a man's reason, which deprives him of the ability to discriminate between right and wrong, and prevents him from acting intelligently. Whenever a man voluntarily commits a crime, with mind enough to distinguish right from wrong, and knows at the time that he is doing wrong, he is criminally responsible for his act.] [4]

Now, gentlemen, on this defense of insanity you have the testimony of the mother, the sister, two brothers and, I think, two uncles. All testify that he was subject to epileptic fits since last November. I think the evidence was that he had an epileptic fit in June of last year. I remember of none after that until the 30th day of November last. Then the testimony of the family is that from that time these fits rather increased in number, two or three in the course of a week or a couple of weeks, and they have described that he would remain under the effect of them sometimes half an hour, sometimes longer, and it could be seen when they were coming on for some time before, and that he would be prostrated for some time after it. You have the testimony of these witnesses that these fits had an effect upon his mind, and they regarded him as insane, and I think nearly all of them testify to that effect. If you believe that testimony you will be satisfied that he may have been subject to epileptic fits, but that alone would not be a sufficient defense in this case, unless this crime was committed during an epileptic fit. The testimony of the family is that on this day, the 29th of March, in the afternoon, I think they said between 4 and 5 o'clock, at the supper table, the defendant became very violent, threatening to kill them, and virtually drove them all out of the house, his mother and sister, and I do not know whether the brother was there at that time or not—

Mr. Robb: The younger brother?

By the Court: The younger brother, perhaps. They went to a neighbor's and remained there over night. [Then we have

the testimony of the two doctors, Dr. Chessrown, the jail physician, and Dr. Diller, that he is insane. Neither of these two physicians, however, saw him in March last; they know nothing personally about his condition last March. Their testimony would be rather more argumentative than positive. I think Dr. Diller spoke about him being rather a weak-minded man, I do not remember his expression, but that is the meaning of it, and he thought from his present condition and from what he heard that he might have been so in March when this was committed.] [5] He testifies to an examination made last week in the jail. I think he said he was there a couple of hours or so examining him, and that while he was there he had a fit; he did not think it was feigned—put on—but that it was a genuine fit, and Dr. Chessrown also spoke about him having a fit, or perhaps more than one. Now, this is the testimony of the defense as to insanity. I think there was one other witness from Beaver county that said something about him being peculiar. I think I have referred to all the testimony on the part of the defense. The commonwealth replies to that testimony. The doctor who attended him and dressed his wound on the morning after this occurrence is not here. We do not know what his opinion is. Some eight or ten of the neighbors who had known the defendant for years and had frequent intercourse with him, and several of them who had intercourse with him last winter, and who worked with him and talked with him afterwards, testify that they never saw anything wrong in him; no indication of any unsoundness of mind. Some of the witnesses saw him at the sale on that Tuesday. One, I think, talked with him, the others did not talk with him but saw him, and saw no indication of anything wrong. The man that sold him the revolver on Friday, and who saw him again on Saturday, testified that he saw nothing to indicate anything wrong with his mind, that he was the same as always. So with other witnesses—neighbors who have known him for years.

Now, gentlemen, it is a question for you on all this evidence. You will take it all into consideration, and if you are not satisfied beyond a reasonable doubt of his guilt, say so. If you are satisfied by the evidence that he was insane at the time he committed this offense; at the time he killed Bertha Spiegel, that he was so far insane that he did not comprehend the crime that

he was committing, but under that impulse of insanity he killed her, if that is the case, you ought to return a verdict of not guilty by reason of insanity. [But if you believe, gentlemen, that he bought that pistol knowing what he was going to do, influenced by any feeling or desire whatever, determined to kill her, and went there to that house that night for that purpose; knew what he was doing; knew he was doing wrong, if you believe that, then he is guilty, and you should say that by your verdict.] [6]

Defendant's points and the answers thereto among others were as follows:

If the jury believe that the defendant, at the time of the killing of Bertha Spiegel, was so disordered mentally as, while intellectually comprehending right and wrong, and knowing the killing of her to be forbidden and punished by law, to be unable to adjust his conduct to the law and avoid that forbidden thing, he is not responsible at least to answer for the higher grade of murder. *Answer :* If the mental condition of the defendant was such that he could not consciously form the purpose to kill and deliberately execute that purpose, he is not guilty of murder of the first degree. [1]

Verdict of guilty of murder of the first degree, upon which sentence was passed. The prisoner appealed.

*Errors assigned* were (1–6) above instructions, quoting them.

*Rody P. Marshall,* with him *John S. Robb,* for appellant, cited on the question of insanity: Mosler v. Com., 4 Pa. 264; Com. v. Coyle, 100 Pa. 573; Taylor v. Com., 109 Pa. 262.

*John C. Haymaker,* district attorney, with him *John S. Robb, Jr.,* first assistant district attorney, for the commonwealth, were not heard, but cited in their printed brief on the question of insanity: Com. v. Bezek, 168 Pa. 603; Ortwein v. Com., 76 Pa. 414; Brown v. Com., 78 Pa. 122; Com. v. Woodley, 166 Pa. 463; Com. v. Gerade, 145 Pa. 289; Com. v. Buccieri, 153 Pa. 535; Com. v. Farkin, 2 Pars. 439.

OPINION BY MR. JUSTICE McCOLLUM, January 18, 1899:

William Hillman, the appellant in this case, is under sentence

of death for the murder of Bertha Spiegel, a girl under fifteen years of age, and for whom he appeared to have formed an attachment evidenced by his frequent visits to her at the home of her grandparents with whom she lived. It was a most atrocious murder with which he was charged and of which he was convicted. That it was committed by him is undisputed, and that he made preparation for it was shown by his purchase, a few days before the murder, of the revolver and cartridges he used in the perpetration of it. We need not describe in this opinion the shocking details of his crime, as the brutality, as well as the commission of it, is unquestioned. All that we have to consider on this appeal is whether the instructions of the court to the jury were adequate and free from error. The first assignment of error relates to the answer of the court to defendant's first point. The point and answer are as follows: "If the jury believe that the defendant at the time of the killing of Bertha Spiegel was so disordered mentally as, while intellectually comprehending right and wrong, and knowing the killing of her to be forbidden and punished by law, to be unable to adjust his conduct to the law and avoid that forbidden thing, he is not responsible, at least to answer for the higher grade of murder." The answer of the court to the point was: "If the mental condition of the defendant was such that he could not consciously form the purpose to kill and deliberately execute that purpose he is not guilty of murder in the first degree." We do not discover in the answer to the point anything prejudicial to the defendant, nor do we think that an unqualified refusal of the point could be properly characterized as error. The evidence in the case certainly furnished no warrant for an unqualified affirmance of it. The cases cited as authority for the point do not sustain it. This clearly appears in the opinions in them. In Commonwealth v. Mosler, 4 Pa. 267, Chief Justice GIBSON, in speaking of moral or homicidal mania, said: " The frequency of this constitutional malady is fortunately small, and it is better to confine it within the strictest limits. If jurors were to allow it as a general motive, operating in cases of this character, its recognition would destroy social order as well as personal safety. To establish it as a justification in any particular case, it is necessary either to show by clear proof its contemporaneous existence, evidenced by present circumstances, or the existence

of an habitual tendency developed in previous cases, becoming in itself a second nature." In Coyle v. Commonwealth, 100 Pa. 573, this Court in speaking of the defense of homicidal mania, said: "The validity of such a defense is admitted, but the existence of such a form of mania must not be assumed without satisfactory proof. Care must be taken not to confound it with acts of reckless frenzy. When interposed as a defense to a commission of a high crime, its existence should be clearly manifest."

These excerpts from the opinions in the cases cited are referred to as showing the kind of proof required to establish the existence of homicidal mania, and the consequences of its recognition in the absence of such proof. In the case at bar no such proof was made, and no suggestion of homicidal mania appears except in the defendant's first point and the argument on appeal.

The only defense interposed in the case was that of insanity, and the principal evidence relied on to establish it was that of the defendant's mother and sister, his two brothers and his uncle, to the effect that he was subject to epileptic fits, the first of which was in June, 1897, the next on the 25th of November following, and that after that time he had them more frequently. These witnesses also testified that the fits to which he was subject had an effect upon his mind, and that they regarded him as insane. To their testimony on this subject may be added that of Dr. Chessrown, the jail physician, and that of Dr. Diller, both of whom testified that in their opinion he was insane. Neither of the doctors, however, had any knowledge of his condition before the murder. In answer to this testimony there was that of the neighbors who testified that they were well acquainted with the defendant and never saw anything in his conduct suggestive of insanity.

The second, third, fourth, fifth, sixth and seventh assignments of error relate to the charge of the court; all of them except the seventh are based on excerpts from it. A careful examination of the charge has satisfied us that there is no ground for reversal in it. The instructions are adequate and impartial and there is no just cause for criticism of them. All the assignments are overruled.

The judgment is affirmed and it is ordered that the record be remitted to the court below for execution.