## The Delaware and Chesapeake Steam Towboat Co. *versus* Starrs.

1. Whether a witness is an expert is a preliminary question to be determined by the court in the first instance.

2. Should the court think him *primâ facie* qualified, the weight to be given to his testimony is for the jury.

3. If it appear that the witness has any claim to the character of expert, a court of error will not reverse, because his experience is not sufficiently special.

4. In a contract for towing, a stipulation, " this barge is towed at the risk of the masters and owners by special contract," &c., meant that the towers did not assume the liability of common carriers nor insure the safety of the barge : and did not reduce the liability of the towers from ordinary to gross negligence.

5. By the contract the master of the barge agreed to have a competent man at the helm, while the tow was in motion ; that the barge was seaworthy and reasonably fit for the trip, having good hatches, with bars, &c., to secure them down, with good canvas covers for the hatches, secured so as to prevent the sea from washing them off in case of a storm ; with sufficient rings, &c., for fasts, and an anchor with chain or cable capable of holding her in case of accident or her breaking loose from the tow.  These are not in the nature of conditions the breach of which avoids the contract.

6. During the passage the tow got out of order ; the towing tug stopped to have it arranged ; in starting again the hawser of the tug broke from the tow, one of the barges ran into the plaintiff's, made a hole in it below the water line ; it filled and sank.  There was no man at the helm of his barge at any time, nor were the hatches in order, &c.  In an action against the company for the loss, the court charged : "The defendants, if guilty of negligence, are not exonerated from responsibility by reason of the non-compliance on the part of the plaintiff with the stipulations in the printed contract, unless the loss was occasioned by that non-compliance, or unless the non-compliance contributed in some degree to the loss."  *Held* to be correct.

February 17th 1871.  Before THOMPSON, C. J., AGNEW, SHARSWOOD and WILLIAMS, JJ.  READ, J., at Nisi Prius.

Error to the District Court of *Philadelphia* : No. 248, to January Term 1871.

This was an action on the case, commenced September 30th 1869, by Francis Starrs against The Chesapeake and Delaware Towboat Company.

The declaration alleged that the defendants were engaged in the business of towing vessels between Philadelphia and Baltimore by means of steamboats ; that the plaintiff delivered his boat to them to be towed from Baltimore ; " and that the defendants so carelessly, negligently and improperly conducted themselves that, by want of due care, skill, diligence and seamanship, by them and their agents, in towing, the plaintiff's boat was sunk."

The plaintiff, on the 11th of August 1869, obtained from the superintendent of the defendants an order for towage of his barge, the " William Murtagh," from Philadelphia to Baltimore and back.

The order was endorsed :—

[D. & C. Steam Towboat Co. *v.* Starrs.]

"This barge is towed at the risk of the master and owners thereof, under special contract with captain or agent, and approved by him."

"Boatmen will read this contract, and, if satisfied, will sign after the word 'approved.'

"The Delaware · and Chesapeake Steam Towboat Company agrees to tow the within-named canal-boat at the risk of the master and owners thereof, and subject to the following stipulations: First. That the said master expressly agrees to have a competent man at the helm of his said boat at all times while the tow is in motion; and Second. That the said master expressly guaranties that his boat is seaworthy and reasonably fit for the trip undertaken; having good hatches, with bars or hooks and staples to secure them down; with good heavy canvas covers for all her hatches, secured so as to prevent the sea from washing them off, should a blow or storm occur on the passage. Third. That said boat has sufficient cleats or rings for fasts, and an anchor with chain or cable capable of holding her in case of accident, or her breaking loose from the tow. Boats will be placed in the tow as the captain of the steamer may think best for the safety of the tow.

"Towing will be done on these terms only."

"Approved,　FRANCIS STARRS."

The plaintiff gave evidence that his boat, on the 14th of August 1869, had been put into a "tow" at Baltimore with nine other boats; the first two tiers had three boats each, two others had two boats each; the "Murtagh" was the middle boat in the second tier. The boats were towed by the steam-tug "William Allison," belonging to defendants. They left Baltimore in the evening, and put into Rock Creek about two hours afterward for the night. They left Rock Creek in the morning, and when they got into the bay the sea was "tolerably rough." In a short time the tug stopped; her hands came on the boats "to fix up the tow;" in starting again the tug broke her hawser; a boat behind the "Murtagh" ran into her stern and made a hole in her below the water-line; she commenced leaking; the hands pumped and threw coal off; they did everything they could to save the boat, but she sank in about an hour.

The plaintiff testified that he had no one at the helm at the time the boat stopped, nor at any time during the voyage.

There was evidence given by plaintiff of the circumstances: as to the condition of the sea, as to the effect of stopping under such circumstances.

Amongst other witnesses the plaintiff called Anthony Gourley, captain of one of the boats in the tow. After stating the occurrences, he said: "I have been boating off and on nine or ten years in canal-boats." He was then asked:—

[D. & C. Steam Towboat Co. *v.* Starrs.]

" Is it safe or prudent for a towboat to stop when a sea is running ?"

The question was objected to by the defendants "as involving the opinion of witness, and not the statement of a fact, the witness not being an expert."

The court admitted the question, and sealed a bill of exceptions.

The witness answered:  " It is not safe to stop with a sea running that way."

The witness testified that there was no one at the tiller of the "Murtagh" or any of the other boats.

Hugh McDonough, another witness, who had been on one of the boats in the tow, having testified as to the occurrence, said: " I have been up and down the Chesapeake many times."

Under objection by the defendants and exception the question asked of Gourlay was put to him.  He answered :—

" Under circumstances such as we were then in, I don't consider it safe and prudent for a steamboat to stop.  It is not safe, because the boats will come into one another."

Manuel McShane testified: "I have followed the water and have been connected with boats as owner or agent since 1860; have frequently seen boats on the water, towboats included; have been on board boats when they were being towed."

The same question, under objection by the defendants and exception was asked him.

He answered :—

" I think it bad judgment for a captain to stop in rough water, for by stopping, the boats are like logs, and roll against each other."

The defendants gave evidence by the captain, that when about starting the tow he found in plaintiff's barge a pile of coal above the after-hatch three or four feet high, and in the middle hatch five or six inches high, and that the coverings of the hatches were in bad order.  After they left Rock Creek the tow began to run badly, and the hands on the tow made no effort to straighten up; it was necessary for speed and safety to do this; the tug was slacked up gradually, keeping the boats in motion " till they were dead;" the captain called back before slacking to the men on the boats to straighten up ; they did not do it, and he put two of his own men to do it; the tow was running as crookedly as it could; the crookedness arose from want of regulation of the lines; the management of the tiller would help to keep the boats straight; it looked as if the breeze would stiffen, and if it had, the whole tow would have been broken up ; the sea was not rough; there was no roll in it ; it would have been more dangerous to the boats to have gone on than to stop and straighten up.

There was much evidence, both from those who were on the " Allison" and saw the occurrence, and others that in the circumstances

the most judicious plan was to stop in order to straighten the tow; also that the "Allison" was well provided with good hawsers and lines, and that the captain was of great skill and long experience.

The defendants' point was:—

"Under the contract between the parties, the plaintiff cannot recover without showing *gross* negligence on the part of the defendants."

The court answered: "I decline so to instruct you. The degree of care required from the defendants was that ordinary care which a prudent man engaged in the business would take. They were not bound to take precautions which were unreasonable, and such as a man of ordinary skill and prudence would not think of resorting to; but it was their duty to use the ordinary care and prudence of men engaged in such a business."

The court, (Thayer J.), further charged:—

"The defendants, if guilty of negligence, are not exonerated from responsibility by reason of the non-compliance on the part of the plaintiff with the stipulations in the printed contract, unless the loss was occasioned by that non-compliance, or unless the non-compliance contributed in some degree to the loss."

The verdict was for the plaintiff for $1000.

The defendants removed the case to the Supreme Court, and assigned for error:

1–3. The rulings of the court below on the questions of evidence,

4–6. The answer to the point.

7. The charge.

*J. G. Johnson*, for plaintiff in error, on the first three assignments cited: Starkie on Evid. 96, note; 1 Redf. on Railw. 553; Note to Carter *v.* Boehm, 1 Sm. L. Cas. 386; 1 Greenleaf on Evid. § 440, in note; Malton *v.* Nesbit, 1 C. & P. 70; Fenwick *v.* Bell, 1 C. & K. 312; Sills *v.* Brown, 9 C. & P. 601; Gauntlett *v.* Whitworth, 2 C. & K. 720; Seaver *v.* R. R. Co., 14 Gray 466; Wiggins *v.* Wallace, 19 Barb. 338; Smith *v.* Gugerty, 4 Id. 614; Harris *v.* Panama R. R. Co., 3 Bosw. 7; Page *v.* Parker, 40 N. H. 47; Otey *v.* Hoyt, 2 Jones Law (N. C.) 70; Hartford Ins. Co. *v.* Horner, 2 Ohio (N. S.) 452; Carr *v.* Northern Liberties, 11 Casey 324; Jefferson Ins. Co. *v.* Cotheal, 7 Wendell 72; Mayor *v.* Pentz, 24 Id. 668; Benkard *v.* Babcock, 17 Abb. Pr. 421; Thompson *v.* Bertrand, 23 Ark. 730; Emerson *v.* Lowell Gas Light Co., 6 Allen 146; Woods *v.* Allen, 18 N. H. 28; Commonwealth *v.* Rich, 14 Gray 335; Lincoln *v.* Barr, 5 Cush. 590.

The contract that the towing was to be at the "risk of the owner," meant *something*, and inasmuch as, without it, defendants

[D. & C. Steam Towboat Co. *v.* Starrs.]

would have been liable only for ordinary negligence, with it they must be held only for such gross negligence as amounts, in effect, to fraud : Wells *v.* Steam Nav. Co., 8 N. Y. 375. Towboat companies are not common carriers: Angell on Carriers, § 86 ; Germania Ins. Co. *v.* Lady Pike, 8 Am. Law Reg. 614 ; Leonard *v.* Hendrickson, 6 Harris 40 ; Hays *v.* Paul, 1 P. F. Smith 134 ; Wells *v.* Steam Nav. Co., 8 New York 375, and Brown *v.* Clegg, 13 P. F. Smith 51. They may make a special contract exempting themselves altogether from liability for the negligence of their servants and agents : Symonds *v.* Pain, 6 Hurlst. & Norm. 709 ; Leonard *v.* Hendrickson ; Brown *v.* Clegg ; Wells *v.* Steam Nav. Co., *supra*.

Keeping a man at the helm of the boat whilst it was in motion ; the having good hatches, with bars, hooks, &c.; the securing the hatches with good canvas covers ; and the providing of an anchor, &c., were *conditions precedent*. Plaintiff cannot sue defendants on their contract to tow, where he failed to perform what he bargained to do in advance : State Mutual Insurance Co. *v.* Arthur, 6 Casey 315 ; Nicol *v.* American Insurance Co. *v.* 3 Wood. & Min. 529 ; Kennedy *v.* Insurance Co., 10 Barb. 285 ; Glendale Co. *v.* Insurance Co., 21 Conn. 19 ; Wilbur *v.* Insurance Co., 10 Cush. 446 ; Sayle *v.* Insurance Co., 2 Curtis 612 ; Carpenter *v.* Insurance Co., 1 Story 57 ; Witherell *v.* Insurance Co., 49 Maine 200 ; Lycoming Insurance Co. *v.* Mitchell, 12 Wright 367; Mead *v.* Insurance Co., 3 Selden 530 ; 1 Parsons on Marine Insurance 337 ; Hore *v.* Whitmore, 2 Cowp. 784 ; De Hahn *v.* Hartley, 1 T. R. 343 ; 2 Bouvier's Dictionary, title *Warranty*, p. 625 ; Jones *v.* Barkley, 2 Doug. 684 ; Benjamin on Sales 421 ; Lowber *v.* Bangs, 2 Wallace 728 ; Stavers *v.* Curling, 3 Bingh. N. C. 355 ; Ritchie *v.* Atkinson, 10 East 295 ; Behn *v.* Burness, 113 E. C. L. R. 749.

*M. P. Henry*, for defendant in error.—A bailee for reward cannot stipulate for exemption for the consequences of negligence of himself or his servants: Penna. R. R. Co. *v.* Henderson, 1 P. F. Smith 315 ; Farnham *v.* The C. & A. R. R. Co., 5 Id. 53.

The words " at the risk of the owners " do not relieve from liability for negligence: Wells *v.* The Nav. Co., 8 N. Y. 375 ; Alexander *v.* Greene, 7 Hill 533 ; Wells *v.* Tucker, 4 Seld. 375 ; The Princeton, 3 Bl. C. C. R. ; The Steamboat New World *v.* King, 16 How. 469 ; Wilson *v.* Brett, 11 M. & W. 113 ; Phillips *v.* Clark, 5 C. B. N. S. 881 ; Austin *v.* Manchester R. R., 16 Jurist 766.

As to contributory negligence, he cited Penna. R. R. *v.* McCloskey, 11 Harris 526.

The opinion of the court was delivered, February 27th 1874, by

[D. & C. Steam Towboat Co. *v.* Starrs.]

SHARSWOOD, J.—The first three assignments of error relate to the admission of the opinions of witnesses produced as experts. It is objected that they were not first shown to be such. This is a preliminary question to be determined by the court in the first instance. If the court shall think they are primâ facie qualified, it will then be for the jury to decide whether any, and, if any, what weight is to be given to their testimony. It is a matter very much within the discretion of the court below, and if it appears that the witnesses offered had any claim to the character of experts, the court will not reverse on the ground that their experience was not sufficiently special. The question in the case now before us related to the proper mode and time of changing the fastening of boats in a tow, when for any reason it became necessary. It cannot be said that those frequently on board of such boats, while being towed, and interested either as captains or owners, have not experience in such matters, though it may not be equal to those engaged on board the tugs. Men who follow the water for a living are generally, I think, close observers; and this results from the monotony of their employment in general. Whenever anything unusual occurs they take accurate notice of it. Captains of boats in a tow stand at their helms all day, or lounge about the deck, with nothing to do or think about; hence they are likely to be keen observers of all the circumstances occurring in the course of a trip. Such men form their opinions from facts within their own experience, and not from theory or abstract reasoning. They come, therefore, even more properly within the definition of experts than men of mere science. We think the three witnesses produced fall properly within the category, and that there was no error in allowing their opinions to go to the jury for what they were worth.

The fourth, fifth and sixth assignments of error may be considered together. Did the contract to tow the canal-boat, "at the risk of the masters and owners thereof," mean to exempt the defendants below from all responsibility for the negligence of their servants? If it did not, it will be unnecessary to consider whether it is competent for an ordinary bailee for hire to make such a stipulation. It is clear that the Steam Towboat Company are not common carriers—in other words, do not insure the safety of the boats they undertake to tow—and that the measure of their liability is, therefore, ordinary skill and care: Brown *v.* Clegg, 13 P. F. Smith 51. It is contended that these words in the contract have, therefore, no legal effect, unless they be construed to mean that the towing company shall not be liable for the negligence of their officers and servants. But this argument is altogether inconclusive and unsatisfactory. Nothing is more common than for men to express in their contracts and other writings that which would be the exact legal result if nothing had been said or written. It cannot be applied as a rule of construction

to extend the meaning beyond what the words themselves authorize. " At the risk of the master and owners," is simply " we, the towing company, do not assume the liability of common carriers—we do not insure the safety of the boat." It cannot be inferred, without great violence to the language, that they meant to say : " We do not undertake to tow the boat as we ought to do." It is quite possible that there might be a contract by which the Steam Towboat Company might hire or let their tug to the owners or captains of the canal-boats, and stipulate that they should employ the officers and servants on board the tug. But surely such a contract cannot be legitimately deduced from words like these in this writing. There was nothing, therefore, to change the legal standard of responsibility—to reduce the liability of the towers from ordinary to gross negligence.

It remains to consider the seventh assignment of error. I think it very clear that the stipulations contained in the contract, subject to which it was made, are not in the nature of warranties—conditions the breach of which avoids the contracts entirely. Such is the principle in cases of this nature, as settled in Hart *v.* Allen, 2 Watts 114, where in an action against a common carrier for a loss, it was held not to be sufficient to entitle the plaintiff to recover, that there was a defect about the vessel, or want of skill in the carrier; but it must also appear that such defect or want of skill contributed or may have contributed in some measure to occasion the loss. There, if the implied stipulation on the part of the carrier that the vessel should be fit and his servants competent, had been expressed, it could have made no difference in the result. Now, inasmuch as against the towboat company a defect in the tug or its crew could not be imputed as a ground of recovery, unless the loss was occasioned thereby, it seems no more than reasonable that the same rule should be applied to the other party to the contract. So in Hice *v.* Kugler, 6 Whart. 336, in an action by the owner of a canal-boat against the steersman, whom he had employed to take her down the river, to recover damages for the loss of the boat, which was carried over a dam, in consequence of the negligence of the defendant, it was held that it was not a sufficient answer to the charge of negligence, that the boat was not properly provided with poles and hands, if the vessel was improperly navigated too near the dam ; and in Souter *v.* Baymore, 7 Barr 415, where the master of a vessel had contracted to carry no other cargo, and in violation of his contract took additional cargo on board, it was held to be no defence to an action for freight that an injury had arisen to the cargo, except so far as the damage resulted from the breach of his contract. The learned judge below left it fairly to the jury to say whether the non-compliance with the stipulations by the plaintiff did or did not contribute to the loss, which under these cases was the only question.          Judgment affirmed.