# Commonwealth *v.* Cavalier, Appellant.

*Criminal law—Murder—Murder by minor—Confession — Premeditation—Intent—Evidence.*

1. A confession by a boy fourteen years and six months of age indicted for murder, is properly admissible, although it was made to police officers and obtained late at night after questioning him at great length, if the confession was not obtained by improper means.

2. Even if such confession were inadmissible, a conviction will not be reversed for its admission, if it appears that the confession was corroborated by circumstances which carried conviction of its truth and of defendant's connection with the crime, and that other evidence in the case was ample to establish the crime.

3. Seven bullets found in the body of deceased from a rifle which carried but a single cartridge, is sufficient to establish intent, deliberation and premeditation in the killing.

4. The law recognizes that a boy fourteen years of age is responsible for his criminal acts.

5. When a child reaches the age of fourteen any special immunity or presumption of incapacity ceases, and the infant is practically an adult in the eyes of the criminal law.

*Criminal law—Murder—Evidence—Insanity—Opinion by experts—Opinion by nonexperts—Physician—Discretion of court.*

6. The question of the competency of a witness to testify as an expert is generally a question for the discretion of the trial court.

7. The opinion of a physician that a defendant in a murder trial was not insane, is admissible, where it appears that the witness was a graduate of a medical school, had been practicing four or five years, and had the general knowledge of the subject of insanity that an ordinary medical practitioner has. He need not have been connected with an institution in which insane persons were treated.

8. The opinion of a nonexpert witness as to insanity should not be received unless in the opinion of the trial judge the facts testified to were sufficient upon which to base such an opinion.

9. The opinion of a nonexpert witness is properly rejected, where, in the opinion of the trial court, the facts testified to by the witness do not indicate insanity, but rather the actions of a bad boy.

*Criminal law—Murder—Irresistible impulse.*

10. The defendant in a murder case cannot set up as a defense that he was carried away at the time by an irresistible impulse, where there is no clear proof of contemporaneous homicidal insanity, or of an habitual tendency which evinced itself at any other time previous to the killing.

11. Under such circumstances, the test of defendant's responsibility is his ability to distinguish between right and wrong.

*Criminal law—Murder—Degree—Charge—Punishment.*

12. A trial judge cannot be convicted of error because, in reading the section of the act covering the crime of murder, he omitted the clause providing that the jury shall ascertain the degree, where it appears that in another part of the charge he stated fully such province of the jury.

13. The trial judge in a murder case may state in his charge that the jury has nothing to do with the punishment.

*Criminal law—Murder—Inquiry as to mental condition—Act of July 11, 1923, P. L. 998.*

14. On an appeal from a conviction of murder, the appellate court cannot consider the refusal of the court below, after verdict, to order an inquiry into defendant's mental condition, as provided by the Act of July 11, 1923, P. L. 998.

Argued September 29, 1925.  Appeal, No. 342, Jan. T., 1925, by defendant, from judgment of O. & T., Schuylkill Co., Nov. T., 1924, No. 1072, on verdict of guilty of murder of the first degree in case of Commonwealth v. William C. Cavalier, alias William C. Yost.  Before MOSCHZISKER, C. J., FRAZER, WALLING, SIMPSON, KEPHART, SADLER and SCHAFFER, JJ.  Affirmed.

Indictment for murder.  Before KOCH, J.

The opinion of the Supreme Court states the facts.

Verdict of guilty of murder of the first degree, on which sentence was passed.  Defendant appealed.

*Errors assigned* were various rulings and instructions, quoting record.

*Prall B. Roads,* with him *Charles W. Staudenmeier,* for appellant.—The court erred in admitting in evidence

the statement purporting to be the written confession of defendant.

Dr. Knight and Mrs. Walker were competent: Stevenson v. Coal Co., 203 Pa. 316; Taylor v. Com., 109 Pa. 262.

The court erred in the part of the charge relating to irresistible impulse: Com. v. Foltz, 5 Pa. D. & C. 559.

The court erred in the part of the charge relating to punishment: Com. v. Switzer, 134 Pa. 383.

*Cyrus M. Palmer,* District Attorney, with him *Morris H. Spicker,* Assistant District Attorney, and *Roger Prosser,* for appellee.—A confession is admissible if affirmatively shown to have been voluntary, whether made to a private individual or to a person in authority: Com. v. Eagan, 190 Pa. 10.

A boy fourteen years of age, under our law, as to his competency to commit crime, stands in exactly the same position as if he were twenty-one or thirty-one: Fife v. Com., 29 Pa. 429; Com. v. Dillon, 4 Dall. 116.

The question whether or not a witness is competent to testify as an expert is a preliminary one for the court: Brennan v. R. R., 230 Pa. 228; Com. v. Wireback, 190 Pa. 138; Com. v. Gibbons, 3 Pa. Superior Ct. 408; Blasband v. Transit Co., 42 Pa. Superior Ct. 325; Com. v. Cressinger, 193 Pa. 326.

OPINION BY MR. JUSTICE SCHAFFER, November 23, 1925:

Counsel for appellant, prosecuting this appeal from a conviction of murder of the first degree, call to our attention the fact that at the time of the commission of the crime their client was a boy not quite six months past the age of fourteen years, and contend that he was not mentally responsible for his crime; also that the record discloses trial errors which should cause us to set the verdict aside. The killing was cold-blooded, premeditated and atrocious, as the confession of the defendant discloses. Telling of its circumstances, he said:

"I was sitting out on the back porch when I first thought about killing my grandmother; she was out in the yard. I then went upstairs and got the 22 calibre rifle out of her room, also some cartridges. I then went downstairs and sat down in a rocking chair until she came in and went upstairs, then I followed her up about five minutes later. The door of her room was open and she was standing at the foot of the bed, sort of sideways. She did not see me as I didn't make any noise going up the stairs. I was standing in the room next to hers in the doorway when I shot her the first time; I aimed for her head; she fell over on the floor. I stood there for a few minutes, then I walked into her room and fired another shot into her body as she was lying on the floor. I then searched her clothes and found her pocketbook in the pocket of her dress, I took the money out and threw the pocketbook in the closet of the room. I put the rifle back in the corner where she always kept it, went downstairs, locking the door of her room when I left it, putting the key in a little bowl on the shelf in the room next to hers. I put some toilet paper in her mouth, as she was lying on the floor, because she was moaning. She was taking off her shoes when I shot her. After I went downstairs I cut the screen in the kitchen window. After cutting the screen I shook the blood off my right hand onto the wall near the door, then I washed my hands and went out on the porch and sat down until my grandfather came home. I told him that grandmother went away. I left the house about half past four and went to my mother's home on First Street and had supper and then went to the movies and after the movies went home and went to bed. Before going to bed I put the money in a pillow under the mattress."

The first position assumed by appellant's counsel is that the confession should not have been received. It is a little difficult to see why it should have been ruled out. There was no evidence going to show that it was not voluntary; on the contrary, all the testimony indicated

that it was. It is true it was uttered to policemen who were investigating the crime (which does not invalidate it: Com. v. Mosler, 4 Pa. 264; Com. v. Eagan, 190 Pa. 10, 20; Com. v. Spardute, 278 Pa. 37, 47) and was made after midnight, when they had questioned the boy for perhaps four hours. There is, however, no evidence that it was obtained by inducements held out to him or by force, threats or duress. The defendant had persisted in the denial of the crime, indeed had thrown suspicion upon an uncle as the perpetrator of it, and maintained this attitude until the bloody suit of clothes which he (defendant) had worn when he did the shooting, found in the closet of the room in which he had slept on the night of the crime, was produced to him. He then admitted that he was the slayer. It is apparent from a reading of the testimony that he recognized the futility of denial when his bloody garments were brought before him. His counsel in their brief say that he does not deny the killing and we agree with what was said by the court in its opinion dismissing the motion for a new trial, that the evidence of the unlawful slaying is overwhelming without the written confession. The argument of his counsel would seem to proceed on the assumption that the confession should have been excluded because he was a boy only fourteen years and six months old when he made it, and since it was made to police officers and obtained late at night after questioning him at great length. As to the age of the boy, that in itself could not exclude the confession, because the law has always recognized that a boy fourteen years of age is responsible for his criminal acts. That it was made to police officers who interrogated him at great length cannot militate against the confession because the police officers in the discharge of their duties as the protectors of society were properly questioning him and entitled to do so and to avail themselves of his answers, provided they did not obtain his statements by improper means, which they testified they did not, and of this there is no denial.

"It is the manner and circumstances under which a confession is procured, not the person to whom it is made, that determines its admissibility": Com. v. Eagan, supra., 21. Furthermore, not only did the defendant confess his crime to the state police, but to several other witnesses, doctors and others, who were called to establish that he was insane. It is not even pretended that these confessions were not voluntarily made. Besides, the confession is corroborated by circumstances which carry conviction of its truth and of defendant's connection with the crime. The rifle with which he did the killing was found where he said it would be. The stolen money was found under the pillow in the bed of his mother's house, in which he slept on the night of the killing, and his suit, covered with blood, in a closet in the room where he said he had put it. His bloody shirt turned inside out to conceal the blood stains was found in the closet of the room where the murder was done, as he stated it would be. The cut in the window screen was as he said it would be found, the toilet paper was in the mouth of his victim, as he said he had placed it, the blood was on the wall near the kitchen door, where he said he had shaken it from his hand, and the key of the door of the room in which he committed the murder was located in the bowl in an adjoining room, where he said he had placed it.

It is the contention of his counsel that the confession is necessary in the case to show that the killing was wilful, deliberate and premeditated or that the crime was committed in the perpetration of a robbery. Our reading of the record does not lead us to so conclude. There was ample and convincing evidence in the case, aside from the confession, to establish the ingredients of murder of the first degree. Seven bullets were found in the body of the deceased. This circumstance in itself is sufficient to establish the intent to kill: Com. v. Eckerd, 174 Pa. 137, 149; Com. v. Caliendo, 279 Pa. 293, 296. That there was deliberation and premeditation in the

killing appears from the fact that the rifle with which
it was done carried but a single cartridge and had to be
reloaded before each succeeding shot.

The defense attempted to be made for appellant is that
he was mentally incompetent and insane at the time of
the killing. To meet this defense, the Commonwealth
called, among other witnesses, Dr. Albert P. Knight,who
in answer to a hypothetical question gave it as his profes-
sional opinion that the defendant knew the nature and
quality of his act and could distinguish between right
and wrong. It is urged that this doctor was not com-
petent to express an opinion. The witness was a prac-
ticing physician, a graduate of the University of Penn-
sylvania, and at the time of the trial had been engaged
in the practice of his profession for some four or
five years. He was at no time connected with an institu-
tion having for its main purpose the treatment of
mental diseases and had not seen very many cases of in-
sanity. He had, as a part of his medical education,
studied the subject of insanity and would appear to have
at least the general knowledge of the subject that
the ordinary medical practitioner has. The question of
the competency of a witness to testify as an expert is
usually for the discretion of the trial court (Whar-
ton's Criminal Law, 11th ed., 1912, vol. 1, p. 108,
note; The Delaware and Chesapeake Steam Towboat
Co. v. Starrs, 69 Pa. 36, 41; Stevenson v. Ebervale Coal
Co., 203 Pa. 316, 331), and we are not convinced that
there was an abuse of discretion in receiving the testi-
mony. "It is not necessary that one should be a pro-
fessed psychiatrist or alienist, in order that his expert
opinion may be received. A physician and surgeon who
has come in contact with a number of cases of insanity in
his general practice may express an opinion as to the
sanity of the defendant": Trickett's Criminal Law
(1908), vol. 2, p. 721. "A general family practitioner
may be received to give an opinion, whatever may be its
weight, as to whatever comes within the range of such

practice": Wharton's Criminal Evidence (10th ed.,
1912), vol. 1, p. 841. It would be an impracticable thing
to lay down a hard and fast rule as to how much ex-
perience a practicing physician must have had with in-
sane persons to qualify him to speak as an expert. We
think the determination of this question is wisely left
with the trial judge, who has the witness before him and
is better competent than we are to judge of his capacity
to express an opinion: 22 Corpus Juris, p. 526. The
weight to be given his opinion is, of course, for the jury.

Challenge is made in the third assignment of error of
the ruling of the court against the admissibility of the
opinion of Carrie Walker, a witness called by the de-
fense, as to the sanity or mental condition of appellant.
This witness was the matron of the House of Detention,
where defendant was kept, following the commission of
the crime, and she had observed him daily during that
period. She testified to certain facts concerning his con-
duct; that he would whistle, but never in tune, that he
fought constantly with the other children in the Deten-
tion House, including those who were younger than
himself, that if she said anything to him, he would not
disobey, but would walk upstairs and would not eat,
that he did not show any remorse for his act, that he
made faces at himself constantly in the mirror and made
faces at her, that he told her he saw a ghost, which turned
out to be a white garment in a closet. The court ex-
cluded her testimony as to the mental condition of the
defendant on the ground that the facts to which she
testified were not sufficient upon which to base an opin-
ion as to the mental condition of the defendant, that
none of them, nor all of them together, indicated in-
sanity. While the cases in this jurisdiction may not be
in accord on the question of the admissibility of the
opinion of a nonexpert witness as to insanity or mental
condition (see Wigmore on Evidence, 2d ed., vol. 4, page
138) and there are cases like Taylor v. Com., 109 Pa.
262, where it is said, at page 270, that the evidence of

such witnesses is receivable after they have testified to acts and conversations which they deem sufficient to found an opinion upon, and that it is for the jury to decide whether the acts and conversations justified the conclusions, nevertheless we think the wise and proper rule is that such opinion testimony should not be received unless, in the opinion of the trial judge, the facts testified to were sufficient upon which to base an opinion. "But when a [lay] witness is offered to express the opinion that the prisoner was sane or insane, he must state facts observed by him, *that, in the judgment of the court,* tend to justify the opinion which he is about to express. Having done this, he may say whether, in his opinion, the defendant was conscious of his purposes, but until he does it, his opinion is properly excluded": Trickett's Criminal Law, vol 2, p. 724; Underhill's Criminal Evidence, 3d ed., section 264; Com. v. Wireback, 190 Pa. 138, 145; Com. v. Marion, 232 Pa. 413, 423; Com. v. Henderson, 242 Pa. 372, 378. The facts testified to by this witness did not to the trial judge and do not to us indicate insanity in the defendant, but rather the actions of a bad boy, therefore the court properly excluded the opinion testimony of this witness. The ruling of the court as to another witness, Robert Walker, husband of the preceding one, who testified to having observed the same acts of the defendant which were testified to by the wife, was proper for the reasons given in disposing of the contention relative to his wife's testimony.

We think possibly that much of the confusion in the cases may be ascribed to the failure to distinguish between different situations obtaining when witnesses are called to testify, on the one hand, that they have noticed nothing which leads them to believe that a person was of unsound mind, and, on the other, that in their opinion a person was insane. A lay witness, who has had contact with one whose mental state is the subject of inquiry, may testify, after stating his opportunities for observation but without first stating all the facts justifying his

conclusion, that he has observed nothing in the conduct or speech of the individual which would lead to the opinion that he is not of normal mind: Com. v. Wireback, 190 Pa. 138, 145. It is one thing to have lay witnesses thus testify and quite a different situation to have them give an opinion, after the recital of facts coming under their observation, that a person was insane: Com. v. Marion, 232 Pa. 413; Com. v. Henderson, 242 Pa. 372. In the latter case, if the facts testified to would not warrant the conclusion of insanity, it would be irrational to permit the witness to pronounce the conclusion. The jury, having the facts before them indicating no insanity, could not, except perversely, come to the conclusion that the given individual was insane.

Defendant's counsel submitted to the court a point couched in the following language: "If the jury, upon their consideration of the evidence, believe that the defendant killed the deceased, to wit, his grandmother, but believe that the defendant was actuated by an irresistible inclination to kill, and his intellect was so impaired and deficient and the defendant had so little control over his will as to render it impossible for him to do otherwise than yield to the inclination to kill, the defendant is entitled to an acquittal, even though he were able to distinguish between right and wrong." Complaint is made because the court did not affirm this point. To have done so would have been to have overturned the law on the subject of the responsibility for crime as it has existed in this Commonwealth at least from Com. v. Mosler, 4 Pa. 264 (1846), down to the present day. See Com. v. Calhoun, 238 Pa. 474; Com. v. DeMarzo, 223 Pa. 573; Com. v. Wireback, 190 Pa. 138; Com. v. Hillman, 189 Pa. 548; Taylor v. Com., 109 Pa. 262; Coyle v. Com., 100 Pa. 573; Ortwein v. Com., 76 Pa. 414. For the court to have affirmed the point as presented would have been a recognition of the "irresistible impulse" theory without limitations or conditions of any sort. If there has been any departure from the wise rule which makes the

test of the accused's responsibility, his ability to distinguish between right and wrong, it has been surrounded at all times with the restrictions imposed by Chief Justice GIBSON, when sitting in the court of oyer and terminer in Com. v. Mosler, 4 Pa. 264, where he said (p. 267) : "The doctrine which acknowledges this mania [an irresistible inclination to kill] is dangerous in its relations, and can be recognized only in the clearest cases. It ought to be shown to have been habitual, or at least to have evinced itself in more than a single instance. ......To establish it as a justification in any particular case, it is necessary either to show, by clear proofs, its contemporaneous existence evinced by present circumstances, or the existence of an habitual tendency developed in previous cases, becoming in itself a second nature." Not only is the point an incorrect statement of the law but there is no evidence which would have warranted its affirmance. The point is quite similar in its wording to that presented to the trial court in Com. v. DeMarzo, 223 Pa. 573, and which the court refused to affirm. We held that this was not error and the reasons given in that opinion apply with equal force here. A somewhat similarly worded point was presented in Com. v. Hillman, 189 Pa. 548, where we said (p. 557) : "The evidence in the case certainly furnished no warrant for unqualified affirmance of it." We find in the record in this case no clear proof of the contemporaneous existence of homicidal insanity, or of an habitual tendency which evidenced itself at any other time previous to the killing. Under these circumstances, the test of defendant's responsibility is his ability to distinguish between right and wrong. Even some of the experts called by the defense admitted he was able to do that.

Complaint is made under the sixth assignment that the court, in giving to the jury the statutory definition of murder, did not read the whole of the section of the act covering the crime of murder but omitted the latter part of it, in which it is provided that the jury shall

ascertain whether it is murder of the first or second degree. This might have been error if the court had not subsequently added to it by stating to the jury that they could render one of four verdicts, murder in the first degree, murder in the second degree, voluntary manslaughter or acquittal, and that it was their duty under the law to determine whether "it be murder of the first degree or murder of the second degree."

The seventh assignment of error is founded upon language used by the trial judge in his supplemental charge to the jury when they came in for further instructions. He told them: "The jury has nothing to do with the punishment in a case. The punishment is determined either by the law of the land or by the judge who imposes the sentence, and then, perhaps, finally may be modified or the party might be released entirely, by the Board of Pardons. So you see you have got nothing to do with punishment. All that you have to do is to find the fact of guilt, and if you cannot find the fact of guilt, if the evidence does not persuade you beyond a reasonable doubt, then, of course, you are bound to acquit." Appellant's counsel base their argument that this was an improper instruction on the ruling in Com. v. Switzer, 134 Pa. 383, 389. That case was one where the indictment charged obstructing a street in a borough; the trial court, by the language there used, gave the jury to understand that the punishment would be light and complaint was evidently made that this led to a verdict of guilty, which otherwise might not have been found. In a number of cases, we have approved statements of the trial judge that the jury in a criminal case has nothing to do with the punishment: Coyle v. Com., 100 Pa. 573; Com. v. Webb, 252 Pa. 187, 196; Com. v. Miller, 258 Pa. 226, 231.

The last complaint urged upon us is that the court, after verdict, refused to order an inquiry into the defendant's mental condition, as provided by the Act of July 11, 1923, P. L. 998, section 308. This assignment

has no place in the record before us. What we are now reviewing is the legality of the defendant's conviction and sentence. Proceedings subsequent thereto, like the one in question, have no place in a review such as we are now conducting. It is proper to remark that we have already passed upon the refusal of the court below to entertain this proceeding in an application for a mandamus brought before us and dismissed. As stated by the trial judge, it is not set forth in the petition whether the alleged insanity of the prisoner occurred before or since his trial and conviction. If it were alleged to have occurred before, then the verdict of the jury and the judgment of sentence thereon conclude that inquiry. If it were alleged to have occurred after sentence and conviction, the verdict could not be set aside on that ground, but the course provided by the act, the removal of the defendant to a state hospital for insane criminals, would have to be carried out.

In view of the earnestness of the argument of appellant's counsel as to his youth, it may not be amiss for us to call attention to the fact that from very early times down to the present it has always been the law that all persons above the age of fourteen, whether they exceed that age by a few months or many years, are presumed to possess the capacity to commit any crime. Blackstone says: "With regard to capital crimes, the law is still more minute and circumspect; distinguishing with greater nicety the several degrees of age and discretion. By the ancient Saxon law, the age of twelve years was established for the age of possible discretion, when first the understanding might open; and from thence till the offender was fourteen it was ætas pubertati proxima, in which he might, or might not, be guilty of a crime, according to his natural capacity or incapacity. This was the dubious stage of discretion; but under twelve it was held that he could not be guilty in will, neither after fourteen could he be supposed innocent, of any capital crime which he in fact committed. But by the law, as

it now stands, and has stood at least ever since the time of Edward the Third, the capacity of doing ill, or contracting guilt, is not so much measured by years and days as by the strength of the delinquent's understanding and judgment. For one lad of eleven years old may have as much cunning as another of fourteen;......one boy of ten, and another of nine years old, who had killed their companions, have been sentenced to death, and he of ten years actually hanged; because it appeared, upon their trials, that the one hid himself, and the other hid the body he had killed; which hiding manifested a consciousness of guilt, and a discretion to discern between good and evil......Thus, also, in very modern times, a boy of ten years old was convicted on his own confession of murdering his bedfellow; there appearing in his whole behavior plain tokens of a mischievous discretion; and, as the sparing this boy merely on account of his tender years might be of dangerous consequence to the public, by propagating a notion that children might commit such atrocious crimes with impunity, it was unanimously agreed by all the judges that he was a proper subject of capital punishment": Blackstone's Commentaries, vol. 4, pp. 23-4. "At common law, a child under seven years is conclusively presumed incapable of crime. ......Between seven and fourteen, the law also deems the child incapable, but only prima facie so; and evidence may be received to show a criminal capacity..... Over fourteen, infants, like all other persons, are prima facie capable; and he who would set up their incapacity must prove it": Bishop on Criminal Law, 9th ed., 1923, vol. 1, sec. 368.

The common law rules concerning children under the age of seven, between seven and fourteen, and over fourteen are followed in the United States except where varied by statute. All of the authorities state that, "When the child reaches fourteen, any special immunity or presumption of incapacity ceases, and the infant is practically an adult in the eyes of the criminal law":

14 Ruling Case Law 265; 31 Corpus Juris, 1096; Wharton on Homicide, 3d ed., 1907, page 12. Several statements by early English writers that fourteen is the age, according to Lord Coke, "which in law is accounted the age of discretion," after which "he is presumed to be responsible for his actions as entirely as if he were forty," are to be found in 36 L. R. A. 207; Bishop on Criminal Law, 9th ed., 1923, vol. 1, section 368.

The substantial basis of the argument of appellant's counsel in this case is that he should not have been convicted of murder of the first degree, because of his youth. Such an argument may be availing if made to the Board of Pardons to bring about a commutation of sentence, but so far as we are concerned it must, under the law, fall upon deaf ears. Our duty is to ascertain whether the defendant's conviction was in accordance with law, whether his offense contains the ingredients necessary to constitute the crime of murder of the first degree and whether the record discloses errors which in our judgment prejudiced his cause and should work a reversal.

We have with great care read the entire record, are satisfied that the defendant committed a murder of the first degree and that there were no errors committed which would justify reversal. Accordingly, all the assignments of error are overruled.

The judgment is affirmed, and the record is remitted to the court below for the purpose of execution.