## In re Clifford

*Lewis Kunkel* and *David S. Kohn,* for Commonwealth.

*Henrietta L. Wickey Beck,* for defendant.

WOODSIDE, J., July 2, 1945.—Shortly after midnight on April 6, 1945, motorists passing through the Borough of Dauphin, discovered that the house occupied by George W. Clifford and family was in flames. They stopped their cars, blew their horns, called and rapped on the doors. Not until after they broke some downstairs windows were they able to arouse any of the occupants of the house. By that time there was no escape from the second floor except through the windows. Kenneth Lee Clifford, an 18-month-old baby, was dropped from the window by his mother, and caught by one of the motorists. George W. Clifford, Jr., age 16, Frances Jean Clifford, age 15, and John E. Clifford, age 12, and their father, George W. Clifford, jumped to safety from the second story windows. Joan Marie Clifford, age 9, was carried down a ladder, but died subsequently from burns she received while in the house. Viola Marie Clifford, wife of George, and mother of the children, and Paul Nelson Clifford, age 9, burned to death in the house.

In making their investigation the State Police learned that immediately after the fire the 12-year-old boy indicated to a neighbor that he had started the fire. To further throw suspicion on the boy one of his playmates came forth with a story that John had threatened to burn down his home. The State police, very properly, took the boy into custody. In the presence of a juvenile probation officer they questioned him at considerable length.

He told them that on the night of the fire his mother was preparing some food for his father who was expected home from work during the late evening; that his mother sent him to the outkitchen or shed, which was built at the side and toward the rear of the house, to get some wood; that he took with him some matches, lit one and found the wood; that he then shook the match and dropped it on the floor and that the match was still red when he left the room with the wood. He said he went back and got another load of wood but did not light a match that time because he knew where the wood was and could get it without the need of light. For a time he persisted in this story, but after considerable questioning and being told that he was "lying" he finally said: "All right, I did it", and signed the following statement:

"Q. What is your full name?

"A. John Edward Clifford.

"Q. Where did you live before you moved to Middletown, Pa.?

"A. I lived in an old house owned by Mr. Weaver, in Dauphin, Pa.

"Q. What happened to this old house?

"A. It burned down last Friday, April 7, 1945.

"Q. What do you think caused it to burn down?

"A. I caused it to burn down by using matches, which I used to get wood out of the shed attached to the house.

"Q. What did you do with these matches?

"A. I lighted two of the matches and threw all of them on the floor.

"Q. What happened when you threw the matches on the floor?

"A. After I threw the matches on the floor I lighted some old paper in the corner of the old shed.

"Q. What happened after that?

"A. I went to bed.

"Q. Why did you light the paper in the shed?

"A. Because I wanted to burn down the little kitchen where the wood was kept.

"Q. Why did you want to burn down the little shed?

"A. So I could get out of the house faster when my mother chased me.

"Q. Did you think it would burn down the house?

"O. No, I didn't.

"Q. Why did you think the house wouldn't burn if you set fire to the shed?

"A. Because there was a wall board between the shed and the house and that wasn't supposed to burn."

He also took the district attorney to the scene of the fire and again said he set the fire.

Section 905 of the Act of June 24, 1939, P. L. 872, 18 PS §4905, known as "The Penal Code", provides:

"Whoever, wilfully and maliciously, sets fire to or burns . . . any dwelling-house, kitchen, shop, barn, stable or other outhouse, that is parcel thereof, or belonging to or adjoining thereto . . . is guilty of arson, a felony . . ."

Section 701 of The Penal Code, 18 PS §4701, provides:

"All murder . . . which shall be committed in the perpetration of . . . arson . . . shall be murder in the first degree."

If John had passed his fourteenth birthday and had set fire to the dwelling-house in the manner and for the reason set forth in his statement he would be guilty of murder of the first degree: Commonwealth v. Bruno, 316 Pa. 394 (1934). For the offense he would have to be tried in the Court of Oyer & Terminer for the Juvenile Court Law of June 2, 1933, P. L. 1433, 11 PS §243, et seq., does not give the juvenile court jurisdiction over murder cases.

John Clifford was born November 16, 1938.[1] He was 12 years, 4 months old at the time of the fire.

---

[1] His age was verified from the State Records.

No charge of murder has been brought against him, but a petition to have him declared delinquent was filed to No. 8 March Juvenile Session, 1945, and the boy has been detained in the detention home of this county since the day the statement was taken from him.

No effort was spared to discover all the facts that might throw any light upon this case. A thorough investigation was made by two State policemen. The district attorney and two of his assistants carefully investigated the facts and ably presented them to the court. Probation officers also made a thorough study and investigation. In addition to the routine physical checkup, the boy had three interviews by a trained psychologist and one interview by a psychiatrist. Their reports were helpful to the court. Sixteen witnesses were called at the various hearings and the boy interviewed several times by the court both before witnesses and in private. The boy's father, maternal grandmother, a maternal aunt, and his school teacher, and all known witnesses who could throw the slightest beam of light on the case were called.

We are faced with the problems of whether we should, with the knowledge of the facts before us, either (1) direct a prosecution for murder or suggest to the district attorney that one be brought; or (2) dispose of the case in juvenile court.

We think the case should be disposed of in juvenile court. In saying this we do not mean to imply that no murder charge could be brought under the law. The assumption of jurisdiction by the juvenile court does not preclude charging the boy with murder should the district attorney see fit to bring prosecution, or should the State police or any other proper person make an information charging such crime: Trignani's Case, 150 Pa. Superior Ct. 491, 494 (1942). All we are justified in saying is that after thorough study of all the facts, which became available to us, we think they do not warrant the prosecution of this boy for murder.

The common-law rules concerning the responsibility of children for criminal acts are followed in the United States except where varied by statute. They are the law in Pennsylvania: Commonwealth v. Cavalier, 284 Pa. 311, 324 (1925).

Bishop on Criminal Law is quoted with approval in the above case by our Supreme Court as follows:

". . . at common law, a child under seven years is conclusively presumed incapable of crime . . . Between seven and fourteen, the law also deems the child incapable, but only *prima facie* so; and evidence may be received to show a criminal capacity . . . Over fourteen, infants, like all other persons, are *prima facie* capable; and he who would set up their incapacity must prove it." Bishop on Criminal Law, 9th ed. 1923, vol. 1, sec. 368.

In discussing cases "in which the will does not join with the act", Blackstone wrote:

"Infants under the age of discretion ought not to be punished by any criminal prosecution whatever."

Discussing the law in England as it was in the middle of the eighteenth century Blackstone said:

"But by the law, as it now stands, and has stood at least ever since the time of Edward the Third, the capacity of doing ill, or contracting guilt, is not so much measured by years and days as by the strength of the delinquent's understanding and judgment. For one lad of eleven years old may have as much cunning as another of fourteen; and in these cases our maxim is, that *'malitia supplet aetatem'*. Under seven years of age, indeed, an infant cannot be guilty of felony, for then a felonious discretion is almost an impossibility in nature; but at eight years old he may be guilty of felony. Also, under fourteen, though an infant shall be *prima facie* adjudged to be *doli incapax*, yet if it appear to the court and jury that he was *doli capax*, and could discern between good and evil, he may be convicted and suffer death. Thus a girl of thirteen has

been burned for killing her mistress; and one boy of ten, and another of nine years old, who had killed their companions, have been sentenced to death, and he of ten years actually hanged; because it appeared, upon their trials, that the one hid himself, and the other hid the body he had killed, which hiding manifested a consciousness of guilt, and a discretion to discern between good and evil. And there was an instance in the last century where a boy of eight years old was tried at Abingdon for firing two barns; and, it appearing that he had malice, revenge, and cunning, he was found guilty, condemned, and hanged accordingly. Thus, also, in very modern times, a boy of ten years old was convicted on his own confession of murdering his bedfellow, there appearing in his whole behavior plain tokens of a mischievous discretion . . . But, in all such cases, the evidence of that malice which is to supply age ought to be strong and clear beyond all doubt and contradiction." Book 4, Blackstone's Commentaries, 23 and 24.

The general principles of the common law concerning the responsibility of youth for their acts as set forth by Blackstone remain the law today. However, we have but to feel the repulsion that comes from reading about the burning to death of a 13-year-old girl, and the hanging of a 10-year-old boy, to realize how our thinking has changed in two centuries, and to appreciate how much more liberal our application of the rule to children of tender age has become. Particularly, has our thinking changed during the last 50 years, within which time practically every State of the Union has adopted a juvenile court law because the ordinary process of the criminal law does not adequately meet the problem of dealing with children in their formative period of life.

The juvenile court laws generally treat the act of those within its age limit (p. 177) ". . . as if done without the 'evil mind' which characterizes felonious

intent . . .": People v. Roper, 259 N. Y. 170, 181 N. E. 88, 91.

On several occasions, including a very recent case, a boy of 14 years of age was sentenced in Pennsylvania for murder, but we can find no reported case of a child under 14 years of age ever having been charged in this Commonwealth with murder.

John Clifford was under 14 years of age and prima facie doli incapax. He was in fifth grade with an average of "D". He was 12 years old and should have been in seventh grade had he not failed two years. The psychiatrist termed him of "normal intelligence" and the psychologist concluded from her tests he was "low average".[2]

Had John passed his fourteenth birthday when the fire occurred we would have directed a prosecution for murder, for a prima facie case was made out by the confession. Regardless of our opinion of his guilt or his innocence the juvenile court would not be the proper tribunal to try the case of a boy 14 years of age whose alleged offense would amount to murder. But the law presumes that a 12-year-old boy is incapable of forming the intent necessary for conviction. Although a 12-year-old boy may not be guilty of murder because of his age and presumed inability to form the necessary intent, nevertheless, under the juvenile court law he may be guilty of delinquency for doing the act, which except for his age, would have been murder.

We have therefore taken jurisdiction of this case in juvenile court and have entered into a full hearing to determine the connection, if any, the boy had with the fire and the death of the three persons. We have also given full consideration to his conduct generally.

---

[2] Although it has no probative value it is comforting to the court to learn that both the psychologist and psychiatrist who studied the boy after he made the statement and who were familiar with many of the facts known to the court, indicated their conviction of his innocence.

From a careful consideration of the evidence before us we are convinced that John did not set the fire in which his mother and brother and sister died, and in fairness to him we think we should make and record such finding of fact.

Under facts which we consider definitely established we think it was impossible for him to have set the fire.

Furniture was kept against the front door of his home so that the only access to the dwelling was through the shed or outkitchen previously referred to. In this shed was the only water spigot. Wood and paper were kept in it. There was no electricity in the house. The fire apparently started in the shed, although the first two people on the scene saw the light of the fire in the front window when they arrived.

During the evening before the fire, sometime close to 10 o'clock, Mrs. Clifford began preparing some food for Mr. Clifford who was at work. She told John to get some wood from the shed. According to his story told immediately after the fire, and at least a dozen subsequent times (both before and after the alleged confession) he took some matches, lighted one, located the wood, shook the match to extinguish it and threw it on the floor. He then took an arm load of wood into his mother. His mother then made him a sandwich and he went to bed.

When his father arrived home from work at between 11:10 and 11:15 Mrs. Clifford had gone to bed. Mr. Clifford entered the house through the shed. He saw no fire and smelled no smoke there. On the stove in the house was the vegetable soup which he ate and then went to bed. At about 11:35 Frances Clifford came home. She entered through the shed, saw the soup and ate some. She then went back into the shed and got a drink of water there. She saw no fire and smelled no smoke. The fire was discovered at about 12:10 and they were all in bed and asleep.

The shed was small and if John had set fire to loose paper as he said in his statement, and described to the district attorney, the fire would have been discovered by his father and sister, if not by his mother.

While the fire was still burning John, crying and sick, was taken to the home of Mrs. Anna Grace Smith. There, when asked how the fire started, he said that he went to get his mother some wood and that he threw a match in the outkitchen and when he went in the house it was still red. His father who heard him say it, said he should keep quiet, that wasn't true because he (the father) would have seen it when he came in.

John told the same story to his neighbor, to his father, to his sister, to his aunt, to the State police, to the district attorney, to the psychologist, to the psychiarist, to his playmate, and to the court. He varied it only temporarily while under questioning by the police and the district attorney. A few days after having made the statement he was again confronted by the State police and district attorney and subjected to a very lengthy and somewhat severe examination capably made by both police and district attorney. He then stuck to the original story.

Both John's school teacher and his aunt testified he was given to bragging about things, including the taking of blame for things he didn't do. The psychologist saw evidence of this trait.

Donny Malehorn said that a few days before the fire John's mother wanted him to go to the store, but he didn't want to go and "he just said; 'I wish I could burn the house one of these times—or something' ". John admitted saying something like that but he insisted it was several months before the fire and that he was not serious when he said it.

Apparently the family spoke loosely about burning the house, for Mrs. Clifford's mother testified she often heard Mrs. Clifford say: "The only way we will ever

get out is to put a match to the place"; and that Frances said the same thing.

The record is replete with incidents pointing toward innocence rather than guilt. Time does not permit us to discuss all of them. We think it is sufficient for us to state here that we are thoroughly convinced the fire could not have started as set forth in John's signed statement. Furthermore, we are convinced that all the occupants of the house, including John, were sound asleep at the time the fire was discovered and we cannot believe that anyone would have set fire to the house and then have undressed, gone to bed on the second floor and fallen fast asleep.

We therefore find as a fact from the evidence before us that John E. Clifford was guilty of no wrongdoing in connection with the death of his mother, sister and brother, and in connection with the burning of the dwelling house in which he was residing in Dauphin.

In support of the petition the allegation was made and freely admitted by John that he broke into a cottage and took some things, and at another time took a $5 bill out of a wallet while the owner was swimming. There were extenuating circumstances in both cases, and they were not called to the attention of the court until after the fire. Because of these offenses, coupled with his conflicting stories about the fire, we think he should be declared delinquent, but we see no necessity for institutional care. We therefore place him on probation for a period of three years from this date, the terms of which have been given to John by the court. They include attendance at the Tri-County Child Guidance Center.

As is customary in all cases heard in juvenile court the press and public were barred from these proceedings. The juvenile court law provides that: "the records of the proceedings of the juvenile courts . . . shall be withheld from indiscriminate public inspection, but shall be open to inspection by the parent or

other representative of the person, institution, association or society concerned, and other persons having a legitimate interest".

In this case the question of the jurisdiction of the juvenile court is involved, because of the possible charge of murder against the juvenile. Because of this, and because of the seriousness of the offense charged and because the court finds the juvenile not guilty of setting the fire, we feel that this matter should not be disposed of except upon full public view. We have therefore written this opinion and publicly released it. We have at the same time directed that all of the testimony taken in the case shall be open for inspection by the public, including the press. We feel that this is an occasion where the right of the public to examine all the facts of the case rise above the right of the juvenile to have the information suppressed.